## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

RITURAJ SINGH PANWAR, on behalf of
himself and all others similarly situated,

      Plaintiffs,

      v.

ACCESS THERAPIES, INC., RN STAFF, INC.,
d/b/a/ REHABILITY CARE,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**1 : 12 -cv- 0 6 1 9 TWP -TAB**

Cause No.:

COMPLAINT – CLASS ACTION

JURY TRIAL DEMANDED

### CLASS ACTION COMPLAINT

1.    This case involves a scheme by Defendants to defraud Access Therapies, Inc.'s ("Access Therapies") and RN Staff, Inc.'s ("RN Staff') foreign employees of wages the federal government requires the Defendants to pay.

2.    Defendants recruit and hire individuals from India, the Philippines, and other foreign jurisdictions to work in the United States to provide healthcare staffing services, such as physical therapy services to third parties. Defendants secure H-1B visas for these foreign employees. H-1B visas enable corporations to hire foreign skilled labor *(e.g.,* employees with a college or graduate degree) so long as the corporations pay H-1B employees at least a minimum "prevailing wage," defined as the wage paid to similarly employed workers in a specific occupation in the area of the intended employment. Defendants certify to the federal government that they will pay their H-1B employees a specific wage (at or above the prevailing wage) and enter into employment agreements with the H-IB workers to pay them these wages. The prevailing wage must be paid (a) for work done for - or on behalf of- the employer, including third-party project work; and (b) during periods of nonproductive time (commonly called "benched" time) where the employer has not provided or arranged work for the H-IB worker. *See* 20 C.F.R. §

655.731 (c)(7).

3.    Defendants' certifications to the federal government have proven false and fraudulent, and they have breached employment agreements with their H-IB workers. Defendants do not pay H-IB employees required wages for project work or during nonproductive/benched time. Rather, upon starting employment, these employees receive no pay until they themselves (or the Defendants) find a paid healthcare staffing project from a third party that satisfies the Defendants' compensation standards. Moreover, once a paid healthcare staffing project ends, Defendants do not pay H-IB employees until another paid project is found and started.

4.    Defendants' scheme violates its H-IB certifications to the government, breaches agreements with H-IB employees, and validates a Department of Homeland Security report documenting fraudulent practices among H-IB employers. *See* United States Department of Homeland Security, "H-IB Benefit Fraud & Compliance Assessment," p. 8 (Sept. 2008).

5.    Mr. Panwar brings this action on behalf of himself and a class of H-IB employees who have not been paid required wages. On behalf of this class, Mr. Panwar seeks damages for the underpayment or nonpayment of wages. In addition, Mr. Panwar brings this action on behalf of H-1B employees who Defendants, contrary to federal law, have forced to pay H-IB visa fees. On behalf of this class, Mr. Panwar seeks damages for the payment of visa fees that H-IB employers are required to pay.

*The Parties*

6.    Plaintiff Rituraj Singh Panwar is a citizen of India, and currently resides in New York, New York.    Mr. Panwar earned a Master's degree in Kinesiology from Southeastern Louisiana University and a second Master's degree in Hospital Management from the University of New Orleans while in the United States on a student visa.

7.    Defendant Access Therapies, Inc. is an Indiana corporation with its principal place

of business at 5980 W. 71st Street, Suite 102, Indianapolis, IN 46278. Access Therapies is responsible for authorizing various false representations and attestations to federal authorities in connection with H-1B visa applications on behalf of Access Therapies' and RN Staffs H-1B workers. Access Therapies has also made false representations to Mr. Panwar.

8.     Defendant RN Staff, Inc., d/b/a Rehability Care, is an Indiana corporation with its principal place of business at 14902 Shelborne Rd., Westfield, IN 46074. RN Staff markets itself as a therapeutic specialist placement service, which engages in the sponsorship of H-1B work visas for qualified physical therapists with residences abroad. While participating in the association-in-fact enterprise with Access Therapies, RN Staff made various false representations to federal authorities in connection with H-1B visa applications on behalf of its H-1B workers. RN Staff has also made false representations to Mr. Panwar.

*Jurisdiction, Venue and Interstate Commerce*

9.     The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 (RICO). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) because certain claims in this action arise under 18 U.S.C. §§ 1961-1968 (RICO). This Court  also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because this action is brought as a class action, diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. Jurisdiction over Mr. Panwar's claims under Indiana law are appropriate pursuant to 28 U.S.C. § 1367.

10.     Venue in the Southern District of Indiana, Indianapolis Division is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a), in that Defendants (either currently or during the relevant time period of this Complaint) inhabit, transact business, reside, are found, or have an agent in this district; a significant portion of the affected interstate trade and commerce described

below has been carried out in this District; and a substantial part of the events giving rise to Mr. Panwar's claims occurred in this District.

11.     Defendants' fraudulent activities were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable effect on interstate commerce.

12.     Relief is sought against Defendants as well as their employees, agents, assistants, and successors.

*Factual Allegations H-1B is a Program Background*

13.     Under the Immigration and Nationality Act, a United States employer can petition the federal government to allow a foreign national to work in the United States as an H-1B nonimmigrant worker. An H-1B worker performs services in a specialty occupation - *e.g.,* an occupation that requires a bachelor's or higher degree (or its equivalent). Examples of H-1B specialty occupations include physical therapists, computer professionals, engineers, accountants, management consultants, scientists, researchers, professors, and attorneys.

14.     H-1B sponsor employers are required to pay their H-1B employees the higher of (a) actual wages the employer pays co-workers in related positions or (b) a prevailing wage for the specialty, as determined by an independent survey of wages paid to workers similarly employed in the geographic area of intended employment. *See* 20 C.F.R. § 655.731(b). For salaried employees, salaries are due in prorated installments *(e.g.,* annual salary divided into 26 bi-weekly pay periods, where employer pays bi-weekly) paid no less often than monthly. *Id.* § 655.731(c)(4). These wage requirements are designed to prevent (a) schemes such as Defendants' *(e.g.,* luring foreign employees to sit idly by, unpaid, while Defendants attempt to find third-party client work that will result in the highest profit for the Defendants) and (b) the influx of cheap foreign labor for professional services.

15.     In order to receive an H-IB nonimmigrant classification    from the federal

4

government and employ H-IB workers, employers must complete a Labor Condition Application

("LCA").    An LCA requires an employer to identify an H-IB employee's job, geographic

location, and specific wage. The LCA also requires the employer to certify that it will pay an H-1B

employee for "non-productive time" as defined by law- *e.g.,* periods of time in which an H-1B

employee is not assigned to a paid client position because the employer has no paid work for him

to do or because the employee lacks a license or permit.    *See* 20 C.F.R. § 655.731(c)(7).   The

industry refers to periods of non-productive time as an H- IB employee being "benched" or "put on

the bench." Benching is described in a Department of Homeland Security report on H-1B fraud:

> "Benching" occurs when an employer temporarily decides to place a
> beneficiary in nonproductive status without pay, or with reduced
> pay, during periods of no work. It should be noted that even H-l B
> workers without a current work assignment (i.e., benched) must be
> paid the prevailing wage.

*See* United States Department of Homeland Security, "H-IB Benefit Fraud & Compliance

Assessment," p. 8 (Sept. 2008).

16.    H-IB employers must file a new LCA if the geographic location of an H-IB

employee's job changes. Different geographic locations have different prevailing wages.

17.    H-IB employers must also provide the H-IB employee with a copy of the LCA that

is filed on his/her behalf. *See* 20 C.F.R. § 655.730(d)(4)(ii).

18.    An H-IB visa is valid only as long as an employer who petitioned the government

for an H-IB visa employs the H-IB employee. If the H-IB employer terminates the employee, the

employee loses his immigration status. The employee typically has to return to his home country

unless another employer receives an H-IB visa for the employee on or about the time the employee

is terminated or the employee otherwise obtains another valid immigration status.

19.    The H-IB employer may not require the H-IB employee to pay a penalty for leaving

employment prior to any agreed date. This restriction, however, does not preclude the employer from seeking liquidated damages that reasonably estimate the extent of damage that the employee's breach of contract would cause. *See* 20 C.F.R. § 655.73 l(c)(10)(i).

*Federal Government Concerns Regarding H-IB Employment Fraud*

20.     The Department of Homeland Security conducted a study of the H-IB visa program, and based on a sampling of H-IB employers, found that some employers were committing fraud by not paying employees (a) prevailing wages in the geographic locations in which employees worked and (b) for benched time. *See* United States Department of Homeland Security, "H-IB Benefit Fraud & Compliance Assessment," p. 8 (Sept. 2008).

21.     Following the Department of Homeland Security report, Senator Grassley expressed concern about "substantial fraud" among H-IB employers:

> We have seen substantial fraud and program violations by employers who bring in H-IB visa holders and then outsource them to other worksites. Such as the case with the indictment of Vision Systems Group, Inc. earlier this year in my home state. U.S. Immigration and Customs Enforcement alleges that the company did not have jobs available for the H-IB workers they petitioned for, and placed them in non-pay status upon arrival in the United States.

Sept. 29, 2009 Letter from Sen. Grassley to A. Mayorkas, available at http://grassley.senate.gov/news/Article.cfrn7customel_dataPageID_l 502=23410.

22.     Senator Grassley also expressed concern that H-1B fraud must be prosecuted and that "[e]mployers need to be held accountable so that foreign workers are not flooding the market, depressing wages, and taking jobs from qualified Americans[.]" *See* Sept. 29, 2009 Press Release, Grassley Works to Ensure Accountability in H-1B Visa Program, available at http://grassley.senate.gov/news/Article.cfm7customel_dataPageID_l 502=23410. *Defendants' H-1B Fraudulent Scheme*

23.     Consistent with the concerns of Senator Grassley and the Department of Homeland Security, Defendants have engaged in a scheme to defraud H-1B employees. Access Therapies and RN Staff share several of the same officers and are organized, upon information and belief, specifically to further their fraudulent scheme. For example, according to records from the Indiana Secretary of State's office, Mr. Prithvi Dhani is President of both Access Therapies and RN Staff. Similarly, Manuel Garcia helped found RN Staff (he is listed as an incorporator of the organization) and is also an Access Therapies Vice President. Defendants' fraudulent scheme functions as follows:

24.     Access Therapies actively recruits potential H-1B employees abroad, primarily in India and the Philippines, as well as domestically, by targeting students who are in the United States on student visas and are nearing graduation. Access Therapies promises these potential employees that it will pay them a specific wage and sponsor their H-1B visa application. If the recruit agrees to work for Access Therapies, Access Therapies then sends the employee a two-year employment agreement that, among other things, specifies the employee's wage/salary and position.

25.     The employment contract that Access Therapies sends to potential employees is a contract between the employee and Rehability Care, not Access Therapies. Access Therapies informs potential employees that Access Therapies functions as Rehability Care. In reality, RN Staff - not Access Therapies - functions as Rehability Care. Further, the employment contract includes a Promissory Note in which an employee agrees to pay Rehability Care $20,000 if the employee fails to complete the two-year employment term. Manuel Garcia, Vice President of Access Therapies, is designated as the witness for this Promissory Note. This Promissory Note helps ensure that H-IB employees remain with Access Therapies - even if underpaid - for fear of

7

paying a $20,000 penalty for failing to complete the agreed-upon employment term. Such a penalty violates the Department of Labor's H-IB regulations. *See* 20 C.F.R. § 655.73 l(c)(10)(i). Further, Access Therapies requires employees for whom a labor condition application ("LCA") is filed to pay the application filing fees (or at least a portion of the fees), which violates the Department of Labor's H-IB regulations. *See* 20 C.F.R. § 655.73l(c)(9)(iii)(C).

26.     After recruiting potential H-IB employees and securing employment commitments from these individuals, Access Therapies then relies on RN Staff to perform the legwork necessary to employ the individuals. For example, RN Staff files the necessary H-IB visa LCAs with the Department of Labor ("DOL") and the U.S. Citizenship and Immigration Services ("USCIS") on behalf of the employees that Access Therapies recruits. In these LCAs, RN Staff certifies (under penalty of perjury) that the employee for whom an application is filed will be paid a specified wage, including payments to be made during non-productive time. Once the DOL approves an RN Staff LCA, the H-IB employee for which the LCA was filed can legally work for RN Staff.

27.     H-1B employees who accept positions with Defendants often face a stark reality: Defendants will not pay employees for non-productive time. Thus, unless a paid healthcare staffing project is found that Defendants deem suitable, employees are not paid. As a result, many employees begin (or continue) working for Defendants only to discover that they have to wait months, unpaid, until Defendants place them with a client.

28.     Plaintiff Panwar's experience is representative of Defendants' fraudulent scheme.

29.     As Mr. Panwar was nearing graduation from the University of New Orleans in 2010, which would result in the expiration of his student visa, Mr. Panwar began exploring work opportunities in the United States. Mr. Panwar submitted his resume to Access Therapies and he received a follow-up phone call from Ramon Villegas, a recruiter for Access Therapies, in April of

2010. During that initial conversation, Mr. Villegas informed Mr. Panwar that Access Therapies was interested in hiring Mr. Panwar as a Physical Therapist and would sponsor his H-1B visa. Mr. Villegas explained that once Mr. Panwar's H-1B visa was approved, he would quickly be assigned to one of Access Therapies' many therapeutic openings in the New York area.

30.   Access Therapies sent an interstate e-mail to Mr. Panwar attaching an Employment Agreement between Mr. Panwar and Reliability Care. In this interstate e-mail, Access Therapies falsely asserted that it did business as Reliability Care, the signatory of the agreement. Mr. Villegas then reiterated this false assertion in an interstate phone call, again explaining to Mr. Panwar that Access Therapies did business as Rehability Care. Manuel Garcia, the vice president of Access Therapies, signed the agreement on behalf of Rehability Care. The Employment Agreement provided that Rehability Care would employ Mr. Panwar as a Physical Therapist for a period of two years at a weekly net pay of $800 - $1,000.  *See* Exhibit 1, incorporated here by reference.  The Employment Agreement also provided that Reliability Care would provide housing for Mr. Panwar for the first three months of his employment, for up to $400 to $600 per month.

31.   Under the terms of the Employment Agreement, Rehability Care promised to sponsor Mr. Panwar for his H-1B visa and complete the necessary paperwork on his behalf. Mr. Panwar signed this Employment Agreement on June 10, 2010 and sent the agreement to Access Therapies via an interstate e-mail.

32.   After Mr. Panwar signed the Employment Agreement with Rehability Care, Mr. Villegas from Access Therapies placed an interstate phone call to Mr. Panwar and demanded that he pay $ 1,500 for the filing of his H-1 B petition, explaining that it was the employee's responsibility to cover his or her visa fees. This was a false and fraudulent representation. Mr.

Panwar responded that he could only afford to pay $750 and Access Therapies agreed that Mr. Panwar would only have to pay this amount. Upon information and belief, either Access Therapies or RN Staff paid the remaining portion of the visa filing fee, as an employer is required to do per DOL regulation.

33.    On July 8, 2010, RN Staff sent USCIS an LCA to secure an H-1B visa for Mr. Panwar. Upon information and belief, RN Staffs LCA was sent via interstate mail or wires. As with all LCA, RN Staffs LCA required RN Staff to certify that Mr. Panwar would be paid a minimum prevailing wage and that Mr. Panwar would be paid at least on a monthly basis (if not more frequently). Neither RN Staff nor Access Therapies ever provided Mr. Panwar a copy of his LCA in violation of DOL regulations. Prior to approving the LCA and granting an H-1B visa for Mr. Panwar, USCIS issued a Request for Further Evidence ("RFE") requesting additional support for the prevailing wage calculation that RN Staff provided in Mr. Panwar's LCA and H-1B application. RN Staff sent to the USCIS via interstate wire additional support for its prevailing wage calculation. Upon information and belief, RN Staff represented to the federal government that it would pay Mr. Panwar a prevailing wage of between $66,477 to $94,182 per year. RN Staffs interstate representations to the federal government that it would pay Mr. Panwar this prevailing wage were false and fraudulent.

34.    Mr. Panwar's H-1B visa was approved on April 5, 2011. On April 8, 2011, on behalf of Access Therapies, Mr. Villegas informed Mr. Panwar via an interstate email that his H-1B visa was approved and encouraged Mr. Panwar to continue studying for the permanent physical therapy license exam, an exam that Access Therapies had encouraged Mr. Panwar to take. *See* Exhibit 2 (April 8, 2011 email from R. Villegas to R. Panwar). Mr. Panwar responded to the April 8, 2011 email by requesting an immediate work assignment, but Access Therapies ignored

Mr. Panwar's request. Further, on an interstate phone call in or around August 18, 2011, Mr.

Villegas - on behalf of Access Therapies - explained to Mr. Panwar that Access Therapies was not

required to pay him until he attained his physical therapy license. This was a false and fraudulent

representation. Pursuant to the Department of Labor's H-1B regulations, Mr. Panwar became

legally employed by Rehability Care as of the time that he made himself available for work, or at

least by April 7, 2011. *See* 20 C.F.R. § 655.73 l(c)(6)(i) ("[T]he H-1B nonimmigrant is considered

to 'enter into employment' when he/she first makes him/herself available for work or otherwise

comes under the control of the employer, such as by waiting for an assignment... or studying for a

licensing exam[.]").

35.     Once his H-1B visa was approved, Mr. Panwar contacted Access Therapies on a

daily basis to inquire about work placement. Mr. Villegas and other representatives from Access

Therapies responded to Mr. Panwar via numerous interstate phone calls and e-mails, simply telling

him that he should focus on his license exam studies and that he would only be paid once he

received his license and was placed with a client. He was repeatedly informed by Access Therapies

via interstate wires that he would not receive a paycheck until he was placed in an assignment that

satisfied Access Therapies' compensation demands. *See, e.g.,* Exhibit 3 (Aug. 16,2011 Email from

R. Villegas to R. Panwar); Exhibit 4 (Nov. 21,2011 Email from R. Villegas to R. Panwar);.

36.     In June 2011, in response to Mr. Panwar's daily calls and e-mails inquiring about

the status of his job placement, Mr. Villegas - on behalf of Access Therapies - made an interstate

phone call to Mr. Panwar and threatened to revoke his H-1B visa if he kept asking about his

placement or his due wages.

37.     Despite the initiation of his employment (by both making himself available for

work and studying for the physical therapy license exam), Mr. Panwar did not receive a single

paycheck from the Defendants between April 7, 2011, and December 16,2011, in violation of H-1B law. *See* 20 C.F.R. § 655.731(c)(6) ("[A]n H-1B nonimmigrant shall receive the required pay beginning on the date when the nonimmigrant 'enters into employment' with the employer.").

38.     On December 5, 2011, Mr. Panwar was assigned to a client in New York City and began receiving weekly paychecks from Rehability Care beginning on December 16, 2011. Rehability Care pays Mr. Panwar $21 per hour (before taxes), and Mr. Panwar is assigned 35 hours of work on average per week. This falls far short of the net $800 - $1000 per week that Rehability Care is contractually obligated to pay Mr. Panwar under the terms of the Employment Agreement. The wages that Rehability Care currently pays Mr. Panwar also breach the terms the LCA filed on Mr. Panwar's behalf, which on information and belief, certified that the prevailing wage due to Mr. Panwar would be in the range of $66,477 to $94,182. Furthermore, neither Access Therapies nor Rehability Care has paid Mr. Panwar the wages legally due to him for the nonproductive time that began on at least April 7, 2011 and ended on December 5, 2011. Finally, neither Access Therapies nor Reliability Care has reimbursed Mr. Panwar for the portion of the visa application fee that he was required to pay.

39.     According to the Foreign Labor Certification Data Center Online Wage Library,[1] Access Therapies has filed over 300 H-IB LCAs in the past year. RN Staff has filed over 100 H-1B LCAs in the past year. Having worked with such a high number of H-IB workers and routinely filing their LCAs, both Access Therapies and RN Staff were aware of H-IB wage requirements, including the laws requiring payment of the actual wage or prevailing wage (whichever is higher) on at least a monthly basis and the requirement that these wages be paid during nonproductive periods. In violation of H-IB wage requirements, the association-in-fact enterprise of Access Therapies and RN Staff has refused to pay Mr. Panwar during the nonproductive work period that

12

has spanned several months since the initiation of his employment.

*Class Action Allegations*

40.    Mr. Panwar brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of a class of:

H-IB visa holders, who worked for Defendants and suffered financial loss due to Defendants' failures to pay required wages and/or visa fees from four years prior to the date of the filing of this Complaint through the present, and continuing until the Defendants' unlawful conduct ceases (the "Class Period").

41.    Excluded from the class are the Court and its officers, employees and relatives, Defendants and their parents, subsidiaries, affiliates, and co-conspirators, and government entities.

42.    Members of the class are so numerous and geographically dispersed that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). While the exact number of class members is unknown[1] to Mr. Panwar, it is believed to be in the hundreds or thousands. Members of the class are readily identifiable from information and records in possession of the Defendants. Access Therapies and RN Staff are required by law to maintain copies of its H-1B workers' LCAs (which indicate identifying information about the H-1B workers, and attestations about work and wages as referenced above), and their payroll records (which indicate payment of wages and lack thereof).

43. Questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members because Defendants have acted on grounds generally applicable to the class. Fed. R. Civ. P. 23(a)(2). Such generally applicable conduct is inherent in Defendants' wrongful conduct. Common questions of law or fact include, but are not limited to:

a.   Whether Defendants engaged, and/or conspired to engage, in a scheme to defraud Defendants' H-1B employees by underpaying

---

[1] The Foreign Labor Certification Data Center is developed and maintained by the State of Utah under contract with the US Department of Labor, Office of Foreign Labor Certification.

13

required wages;

b.  Whether Defendants' conduct violates the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962;

c.  Whether Defendants' conduct and failures to pay Mr. Panwar his full required wages violates constitutes a breach of contract or otherwise violates Indiana law;

d.  Whether Mr. Panwar and other class members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

e.  Whether Mr. Panwar and the other class members are entitled to an award of compensatory, treble, and/or punitive damages, and, if so, in what amount; and

f.  Whether Mr. Panwar and the other class members are entitled to injunctive or other equitable relief.

44.   Mr. Panwar's claims are typical of the claims of the members of the class. Fed. R. Civ. P. 23(a)(3). Mr. Panwar and all members of the class were similarly damaged by Defendants' conduct.

45.   Mr. Panwar will fairly and adequately protect the interests of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Mr. Panwar is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent Mr. Panwar and other members of the class. Fed. R. Civ. P. 23(a)(4).

46.   The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which could establish incompatible standards of conduct for Defendants. Fed. R. Civ. P. 23(b)(1)(A).

47.   This class action is the superior method for the fair and efficient adjudication of this

14

controversy. Class treatment will permit a large number of similarly-situated individuals to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would produce. The damages sustained by individual class members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed Defendants. Fed. R. Civ. P. 23(b)(1)(B).

48.     This case will be eminently manageable as a class action. Mr. Panwar knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action. Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I - VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("RICO"), 18 U.S.C. § 1962(C)

*(against all Defendants)*

49.     Mr. Panwar incorporates paragraphs 1 - 48 by reference as if fully forth herein.

50.     Title 18 U.S.C. § 1962(c) of RICO prohibits "any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c).

51.     At all times relevant to this Complaint, Defendants each constituted a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

52.     Defendants were associated-in-fact and constituted - and continue to constitute -an "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaging in and affecting interstate commerce. At all times relevant to this Complaint, Defendants agreed to and did conduct and directly or indirectly participate in, or aided and abetted, the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including (a) false

15

and fraudulent representations to the federal government; (b) false and fraudulent representations to Mr. Panwar; (c) underpayment of Mr. Panwar's wages in violation of federal law; (d) immigration document falsifications in violation of 18 U.S.C. § 1546; (e) interstate mail fraud in violation of 18 U.S.C. § 1341; and (f) interstate wire fraud in violation of 18 U.S.C. § 1343. These violations included, but are not limited to, the acts discussed in the prior paragraphs of this Complaint and in the paragraphs below.

53.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Mr. Panwar has been injured in his business and property in an amount to be proven at trial.     For example, Mr. Panwar suffered from unpaid wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses as a result of the Count I Defendants' acts.

## COUNT II - VIOLATION OF RICO, 18 U.S.C. § 1962(d) (RICO CONSPIRACY)

### (against all Defendants)

54.     Mr. Panwar incorporates paragraphs 1 - 53 by reference as if fully forth herein.

55.     As set forth above, Defendants unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c). Specifically, Defendants committed overt acts in furtherance of the conspiracy as described above.

56.     Defendants have intentionally conspired and agreed to directly and indirectly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

57.     As a direct and proximate result of Defendants' conspiracy, the overt acts taken in

16

furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Panwar has been injured

in his business and property in an amount to be proven at trial by reason of Defendants' violation of

18 U.S.C. § 1962(d).      For example, Mr. Panwar suffered from unpaid wages, bonuses, and

benefits, and incurred other incidental and consequential damages and expenses (such as paying a

portion of the H-1B visa fee) as a result of Defendants' acts.

## COUNT III - VIOLATION OF THE INDIANA RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("INDIANA RICO"), IND. CODE § 35-45-6-2

### *(against all Defendants)*

58.      Mr. Panwar incorporates paragraphs 1 - 57 by reference as if fully forth herein.

59.      Indiana RICO prohibits any person "employed by or associated with an enterprise

... [who] knowingly or intentionally conducts or otherwise participates in the activities of that

enterprise through a pattern of racketeering activity." Ind. Code § 35-45-6-2(3).

60.      At all times relevant to this Complaint, the Defendants each constituted a "person"

within the meaning of Ind. Code § 35-45-6-2(3).

61.      Defendants were associated in fact and constituted - and continue to constitute -an

"enterprise" within the meaning of Ind. Code § 35-45-6-2(3). At all times relevant to this

Complaint, Defendants agreed to and did conduct and directly or indirectly participate in, or aided

and abetted, the conduct of the enterprise's affairs through a pattern of racketeering activity in

violation of Ind. Code § 35-45-6-2(3), including (a) false and fraudulent representations to the

federal government; (b) false and fraudulent representations to the Mr. Panwar; (c) nonpayment of

Mr. Panwar's wages in violation of federal law; (d) immigration document falsifications in

violation of 18 U.S.C. § 1546; (e) interstate mail fraud in violation of 18 U.S.C. § 1341; and (f)

interstate wire fraud in violation of 18 U.S.C. § 1343. These violations included, but are not

limited to, the acts discussed in the prior paragraphs of this Complaint.

62.     As a direct and proximate result of Defendants' racketeering activities and violations of Ind. Code § 35-45-6-2(3), Mr. Panwar has been injured in his business and property in an amount to be proven at trial. For example, Mr. Panwar suffered from lost wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses (such as paying a portion of the H-1B visa fee) as a result of Defendants' acts.

## COUNT IV- VIOLATIONS OF INDIANA STATUTORY WAGE LAW

*(against all Defendants)*

63.     Mr. Panwar incorporates paragraphs 1 - 62 by reference as if fully set forth herein. Mr. Panwar advances Count VI against all Defendants.

64.     The Defendants' failure to pay Mr. Panwar his full wages violated Indiana statutory wage law, including but not limited to Ind. Code 22-2-5-2.

65.     Mr. Panwar suffered from lost wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses as a result of the Defendants' acts.

## COUNT V- BREACH OF CONTRACT UNDER INDIANA COMMON LAW

*(against RN Staff d/b/a Rehability Care)*

66.     Mr. Panwar incorporates paragraphs 1 - 69 by reference as if fully set forth herein. Mr. Panwar advances Count VII against Rehability Care.

67.     Rehability Care's failure to pay Mr. Panwar his full wages as promised in and required by their contract was in breach of contract under Indiana common law.

68.     Mr. Panwar suffered from lost wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses as a result of Rehability Care's acts.

18

## COUNT VI- UNJUST ENRICHMENT UNDER INDIANA COMMON LAW

### *(against all Defendants)*

69.     Mr. Panwar incorporates paragraphs 1 - 72 by reference as if fully set forth herein. Mr. Panwar advances Count VI against all Defendants.

70.     The Department of Labor's H-IB regulations require an H-IB employer to be responsible for all fees associated with the H-IB visa application process. 20 C.F.R. § 655.73 l(c)(9)(iii)(C).

71.     The Defendants' demand that Mr. Panwar pay a portion of the visa application fee was a breach of the H-IB regulations and constitutes unjust enrichment under Indiana common law.

### JURY TRIAL DEMAND

72.     Pursuant to Fed. R. Civ. P. 38(b), Mr. Panwar, on his own behalf and on behalf of the class, demand a trial by jury of all claims asserted in this Complaint so triable.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Panwar requests entry of judgment against Defendants, jointly and severally:

a.     Certifying that this action may be maintained as a class action under Rule23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appointing Mr. Panwar as class representative and his counsel as lead class counsel;

b.     Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to members of the Class;

c.     Awarding Mr. Panwar and the Class their full monetary damages to be proven at trial;

d.     Awarding Mr. Panwar and the Class their unpaid wages, as well as liquidated

damages, interest, and all civil remedies available under Indiana statutory law and common law;

    e.    Awarding Mr. Panwar and the Class treble their monetary damages, pursuant to 18U.S.C.§1964;

    f.    Awarding all civil remedies under 18 U.S.C. § 1593 (mandatory restitution) to be paid in addition to any other civil penalties authorized by law;

    g.    Awarding Mr. Panwar and the Class pre-and post-judgment interest on their damages;

    h.    Awarding Mr. Panwar and the Class the costs of this action and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1595, 1964 and Indiana statutory law and common law;

    i.    Enjoining Defendants from continuing or resuming their unlawful and fraudulent practices;

    j.    Awarding all other legal or equitable relief as appropriate to effectuate the purposes of the Indiana wage statutes as referenced above; and

    k.    Awarding Mr. Panwar and the Class such other and further relief as the Court deems just and proper.

Respectfully submitted,

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS, LLP
Attorney No. 11362-49
54 Monument Circle, 4th Floor
Indianapolis, Indiana 46204
Telephone: (317) 632-4402
Facsimile: (317) 632-5595
awirick@humesmith.com

*Of Counsel*

Daniel A. Kotchen
Daniel L. Low
Robert Klinck
Alicia Gutierrez
Justin Ervin
KOTCHEN & LOW LLP
2300 M Street, NW
Suite 800
Washington, DC   20037
(202) 416-1848
(202) 280-1128 (fax)
dkotchen@kotchen.com
dlow@kotchen.com

Michael F. Brown
PETERSON, BERK, & CROSS, S.C.
200 E. College Ave.
Appleton, WI   54912
920-831-0300
920-831-0165 (fax)
mbrown@pbclaw.com

Vonda K. Vandaveer
V.K. Vandaveer, P.L.L.C.
P.O. Box 27317
Washington, DC   20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com