**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| RITURAJ SINGH PANWAR, on behalf of himself and all others similarly situated,<br><br>                                 Plaintiff,<br><br>                             v.<br><br>ACCESS THERAPIES, INC.,<br>RN STAFF, INC., doing business as<br>REHABILITY CARE, and<br>RAMON VILLEGAS,<br><br>                            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 1:12-cv-00619-TWP-TAB<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>ENTRY ON MOTION TO DISMISS</u>**

      This matter is before the Court on a Motion to Dismiss filed by Defendants Access Therapies, Inc. ("Access Therapies"), RN Staff, Inc. (d/b/a Rehability Care) ("RN Staff" or "Rehability Care"), and Ramon Villegas ("Mr. Villegas") (collectively, "Defendants") (Dkt. 68). Plaintiff Rituraj Singh Panwar ("Mr. Panwar") filed this lawsuit against the Defendants on behalf of himself and all others similarly situated for violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1662(C) ("RICO"), the Trafficking Victims Protection Act, 18 U.S.C., §§ 1589-90, 1595 ("TVPA"), the Indiana Statutory Wage Law, Ind. Code § 22-2-5-2 ("Indiana Wage Law"), the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Additionally, Mr. Panwar asserts claims under Indiana common law for breach of contract and unjust enrichment.  Defendants argue that Mr. Panwar's claims actually allege violations of the Immigration and Nationality Act and must be dismissed because he did not exhaust his

administrative remedies prior to bringing this lawsuit.  For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## I.  BACKGROUND

The following facts are from Mr. Panwar's Second Amended Class Action Complaint (Dkt. 63) ("Second Amended Complaint") and are accepted as true for purposes of this motion to dismiss.  Mr. Panwar is a citizen of India and currently resides in New York, New York.  Mr. Panwar earned a Master's degree in Kinesiology from Southeastern Louisiana University and a second Master's degree in Hospital Management from the University of New Orleans while in the United States on a student visa.  Access Therapies is an Indiana corporation with its principal place of business in Indianapolis, Indiana.  RN Staff, which does business under the name Rehability Care, is an Indiana corporation with its principal place of business in Westfield, Indiana.  Access Therapies and RN Staff share several of the same officers, including Prithvi Dhani, who is President of both Access Therapies and RN Staff, and Manuel Garcia, who is listed as an incorporator of both RN Staff and Vice President of Access Therapies.

### A.      The H-1B Visa Program

A United States employer can petition the federal government to allow a foreign national to work in the United States as an H-1B nonimmigrant worker in certain specialty occupations under the Immigration and Nationality Act ("INA"). Under the H-1B visa program, employees are required to perform services in specialty occupations that typically require a bachelor's or higher degree.   Examples of specialty occupations include physical therapists, computer professionals, engineers, scientists, professors, and attorneys.  H-1B employers are required to pay their H-1B employees the higher of (a) actual wages the employer pays co-workers in related positions, or (b) the prevailing wage for the specialty occupation, as determined by an

independent survey of wages paid to workers similarly employed in the geographic area of intended employment. Employers are also required to pay H-1B employees for "non-productive time," which are periods of time in which an H-1B employee is not assigned to a paid client position because the employer has no paid work for him to do or because the employee lacks a license or permit. The industry refers to periods of non-productive time as "benching." The wage requirements are designed to prevent employers from luring foreign employees to sit idle, unpaid, while the employer attempts to find third-party client work, and also to prevent the influx of inexpensive foreign labor for professional services. Failure to pay an H-1B employee for "benched" time is considered fraud under the INA.

In order to receive an H-1B nonimmigrant classification from the federal government and employ H-1B workers, employers must complete a Labor Condition Application ("Application") and file it with the Department of Labor ("DOL"). The Application requires the employer to identify an H-1B employee's job, geographic location, and specific wage. The Application also requires the employer to certify that it will pay the H-1B employee for non-productive time. H-1B employers must file a new Application if the geographic location of an H-1B employee's job changes, and an H-1B visa is valid only as long as an employer who petitioned the government for an H-1B visa employs the H-1B employee. If the employer terminates the employee, the employee loses his immigration status and typically has to return to his home country unless another employer receives an H-1B visa for the employee at or about the time the employee is terminated, or if the employee otherwise obtains another valid immigration status. The employer may not require the H-1B employee to pay a penalty for leaving employment prior to any agreed date; however, the employer may seek liquidated damages from the employee's breach of

contract that cover reasonably estimated damages.   The employer also may not require the employee to pay the H-1B visa application fee.

**B.      Access Therapies' and RN Staff's Operations**

Access Therapies actively recruits potential H-1B employees abroad, primarily in India and the Philippines, as well as domestically by recruiting students who are in the United States on student visas and are nearing graduation.  Access Therapies promises potential employees that it will pay them a specific wage and sponsor their H-1B visa applications.   If the individual accepts the employment offer, Access Therapies sends the employee a two-year employment agreement (the "Employment Agreement") that, among other things, specifies the employee's wage/salary and position.   However, the employment contract is between the employee and Rehability Care, not Access Therapies.  Access Therapies tells the employee that it does business as Rehability Care, but RN Staff is actually the company doing business as Rehability Care.  The employee is also required to execute a Promissory Note in which the employee agrees to pay Rehability Care $20,000.00 if the employee fails to complete the two-year employment term. Employees are also required to pay the application fees for filing the Application.

After recruiting potential employees and securing employment commitments from these individuals, Access Therapies then relies on RN Staff to file the necessary paperwork to obtain the H-1B visa, including filing the Application with the DOL and the U.S. Citizenship and Immigration Services.   In the Application, RN Staff certifies that the employee for whom an application is filed will be paid a specified wage, including payments to be made during non-productive time.   Once the DOL approves an RN Staff Application, the H-1B employee for whom the Application was filed can legally work for RN Staff/Rehability Care.

C.      **Mr. Panwar's Employment**

Mr. Panwar applied for a position as a physical therapist with Access Therapies around the time he was to graduate from the University of New Orleans in 2010.  Mr. Villegas, a recruiter for Access Therapies, followed up with Mr. Panwar in April 2010 and informed him that Access Therapies was interested in hiring him and would assign him to one of its openings in the New York area once his H-1B visa was approved.  Access Therapies e-mailed Mr. Panwar an Employment Agreement, which was between Mr. Panwar and Rehability Care.  Rehability Care agreed to sponsor Mr. Panwar for his H-1B visa and complete the necessary paperwork on his behalf.  In both the e-mail and in a telephone conversation, Mr. Panwar was told that Access Therapies did business as Rehability Care, not RN Staff.  Under the terms of the Employment Agreement, Rehability Care was to employ Mr. Panwar as a physical therapist for a period of two years at a weekly net pay of $800.00 to $1,000.00.  The Employment Agreement also provided that Rehability Care would provide housing for Mr. Panwar for the first three months of his employment, for up to $600.00 per month.

Mr. Panwar signed the Employment Agreement on June 10, 2010.  After Mr. Panwar signed the Employment Agreement, Mr. Villegas called Mr. Panwar and demanded that he pay $1,500.00 for the filing of his H-1B application, falsely telling him that it was the employee's responsibility to cover his visa fees.  Mr. Panwar responded that he could only afford to pay $750.00, which Access Therapies accepted.  On July 8, 2010, RN Staff sent U.S. Citizenship and Immigration Services an Application to secure an H-1B visa for Mr. Panwar.  RN Staff certified that Mr. Panwar would be paid the prevailing wage and that he would be paid at least on a monthly basis.  Mr. Panwar was never provided a copy of the Application.

Mr. Panwar's H-1B visa was approved on April 5, 2011.  On April 8, 2011, Mr. Villegas told Mr. Panwar that his H-1B visa had been approved and encouraged him to continue studying for the permanent physical therapy license exam, but did not provide him a job assignment.  Mr. Panwar responded by requesting an immediate work assignment, but Access Therapies ignored his request.  On August 18, 2011, Mr. Villegas told Mr. Panwar that Access Therapies was not required to pay him until he attained his physical therapy license, which is contrary to DOL regulations for the H-1B visa program.  Mr. Panwar contacted Access Therapies on a daily basis to inquire about a work assignment, but was repeatedly told that he should focus on his license exam and would only be paid when he received his license and was placed with a client.  In June 2011, Mr. Villegas called Mr. Panwar and threatened to revoke his H-1B visa if he kept asking about his placement or payment for non-productive time.  From April 2011 until December 2011, Mr. Panwar did not receive any payments from Access Therapies or RN Staff.

On December 5, 2011, Mr. Panwar was finally placed with a client in New York City. Rehability Care paid him a gross wage of $21.00 per hour, and he was assigned approximately 35 hours per week.  This amount was less than the $800.00 to $1,000.00 per week net pay agreed to under the terms of the Employment Agreement, and less than the prevailing wage in the range of $66,477.00 and $94,182.00 stated in the Application.  Mr. Panwar never received payment for non-productive time, nor was he reimbursed for the $750.00 he paid toward the H-1B visa application fee.

Mr. Panwar filed his original Complaint in this case on May 8, 2012 (Dkt. 1).  On May 9, 2012, the same day Defendants were served with the Complaint, Mr. Villegas left Mr. Panwar a voicemail message threatening to terminate his employment and revoke his visa because he had filed the lawsuit.  Mr. Panwar's attorney returned the call, informing Mr. Villegas of the possible

6

legal consequences for terminating Mr. Panwar's employment.  The following day, Mr. Villegas sent Mr. Panwar an e-mail informing him that his employment had been terminated.  Mr. Panwar had not filed any complaints with the DOL prior to filing his Complaint in this Court.

## II. <u>LEGAL STANDARD</u>

When reviewing a 12(b)(6) motion, the Court takes all well-pleaded allegations in the complaint as true and draws all inferences in favor of the Plaintiffs.  *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008) (citations omitted); Fed. R. Civ. P. 12(b)(6).  However, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citations omitted).   To be facially *plausible*, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Additionally, the court is not required to accept the plaintiffs' legal conclusions in their complaint as true.  *Id.*

## III. <u>DISCUSSION</u>

As an initial matter, Mr. Panwar asserts that the Defendants' 12(b)(6) motion to dismiss is untimely because they have already filed an answer to Mr. Panwar's First Amended Complaint (Dkts. 16; 44 & 45), and the Second Amended Complaint did not add any new counts; it only enlarged the proposed class by two years and clarified that certain causes of action were brought on behalf of the putative class. He argues that when a defendant has already answered a

complaint, a Rule 12(b) motion in response is improper unless it is directed only at the new allegations in the amended complaint.   Under Seventh Circuit law, however, "it is well established that the amended pleading supersedes the original pleading . . . . 'Once an amended pleading is interposed, the original pleading no longer performs any function in the case. . . .'" *Wellness Cmty.-Nat'l v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995) (quoting 6 C. Wright, A. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1476 at 556–57, 559 (1990)). Defendants filed their Motion to Dismiss in lieu of an answer to the Second Amended Complaint, thus the Rule 12(b)(6) motion is proper.   Regardless, the standards under Rule 12(c) and 12(b)(6) are identical.  *Pisciotta*, 499 F.3d at 633.

Defendants move to dismiss all counts of Mr. Panwar's Second Amended Complaint, arguing that, regardless of the causes of actions set forth in the complaint, he is essentially asserting claims for violations of the INA which would require that he first exhaust his administrative remedies through the DOL.   Pursuant to statutory authority under 8 U.S.C. § 1182(n)(2)(A), the Secretary of Labor has established administrative procedures by which aggrieved nonimmigrants working under the H-1B visa program can seek redress.  20 C.F.R. § 655.805(a)(1) and (2).   Under the INA, an aggrieved party must first file a complaint with the Wage and Hour Division of the DOL, which then makes a determination of the validity of the complaint.  8 U.S.C. § 1182(n)(2)(A)-(n)(5)(A).   If the party is dissatisfied with this decision, he can then make an appeal to an administrative law judge.   20 C.F.R. §§ 655.840, 655.820, 655.840.  If the party disagrees with the administrative law judge's decision, he can then petition to the Secretary of Labor for review.   20 C.F.R. §§ 655.840, 655.845.   After appealing to the Secretary of Labor, the party may then pursue remedies in the appropriate United States District Court.  20 C.F.R. § 655.850.   Courts have held that there is no private right of action, absent

exhaustion of administrative remedies, for parties who believe their employer violated the terms of an H-1B visa agreement in violation of the INA, and such claims are appropriately dismissed under Rule 12(b)(6). *Alves v. Masters Entm't Grp., LLC*, No. 3:07-CV-305-TS, 2008 WL 4452145, at *4 (N.D. Ind. Sept. 30, 2008); *see also Zhang v. China Gate, Inc.*, No. 2686834, 2007 WL 2686834 (W.D. Wash. Sept. 7, 2007); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418 (4th Cir. 2005); *Shah v. Wilco Sys., Inc.*, 126 F. Supp. 2d 641 (S.D.N.Y. 2000).

Mr. Panwar asserts that he has brought claims under other federal statutes and state statutory and common law, not under the INA, and therefore he is not required to follow the administrative procedures set forth above. However, a plaintiff may not circumvent the non-availability of a private cause of action under § 1182(n) of the INA simply by pleading the same claim under a different cause of action. *Shibeshi v. Philander Smith College*, No. 4:11CV00513JMM, 2011 WL 4529455, at *2 (E.D. Ark. Sept. 30, 2011). Thus, the Court must determine whether there is an independent basis for each of Mr. Panwar's causes of action, or whether he is merely restating a claim for violations of the INA.

## A.    Violations of RICO

In Counts I and II of Mr. Panwar's Second Amended Complaint, he alleges that the Defendants are an enterprise that conducted its affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d). Specifically, Mr. Panwar alleges the racketeering activity includes false and fraudulent representations to the federal government, Mr. Panwar, and other class members; underpayment of Mr. Panwar's and other class members' wages in violation of federal law; immigration document falsification in violation of 18 U.S.C. § 1546; interstate mail and wire fraud; and retaliation against Mr. Panwar by threatening and terminating his job and visa.

To state a claim under RICO, a plaintiff must show the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). In addition, the complaint must identify the enterprise, which "must be more than a group of people who get together to commit a 'pattern of racketeering activity'. . . and more than a group of associated businesses that 'are operated in concert' under the control of one family." *Id.* at 645 (internal citations omitted). The enterprise need not be a formal legal entity; an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct and can be shown by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009).

To be liable under RICO, the person (or corporate entity, as the case may be) must participate in the operation or management of the enterprise itself, and must be separate and distinct from the enterprise. *Richmond*, 52 F.3d at 646. Liability requires a showing that the defendants conducted or participated in the conduct of the enterprise's affairs, "not just their *own* affairs." *Id.* (emphasis in original); *see also Browning v. Flexteel Indus., Inc.*, No. 3:11-cv-480 JD, 2013 WL 3224593 (N.D. Ind. June 25, 2013) ("[A]n association-in-fact enterprise must be meaningfully distinct from the entities that comprise it such that the entity sought to be held liable can be said to have controlled and conducted the enterprise rather than merely its own affairs.") The association-in-fact enterprise also must have some sort of structure consisting of at least three features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose. *Browning*, 2013 WL 3224593 at *6 (citing *Boyle*, 566 U.S. at 946).

Mr. Panwar's Second Amended Complaint fails to sufficiently allege the existence of an enterprise for purposes of RICO liability.  The conduct alleged by Mr. Panwar merely involves the companies' own affairs, including recruiting, hiring, and placing employees, and not the affairs of a separate enterprise.  Mr. Panwar also has not alleged that the Defendants had a structure and goals separate from the predicate acts themselves, which is necessary for a finding of an association-in-fact enterprise.  *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) ("A RICO enterprise is more than a combination of persons who commit alleged predicate acts of racketeering.").  The fact that the Defendants allegedly used fraudulent means to carry out their own business affairs does not automatically turn them into a RICO enterprise. Every conspiracy is not an enterprise for RICO purposes.  *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999).

Defendants also do not meet the "family resemblance" test articulated by the Seventh Circuit in *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997).  Under the family resemblance test, the court should determine how close the current case is to the prototypical RICO case.  *Id.* at 227.  The prototypical RICO case is one in which a person seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetuate more, and less easily discovered, criminal acts than he could do without channeling his criminal activities through the enterprise that he has taken over.  *Id.*  The operations of Access Therapies and RN Staff do not resemble the prototypical RICO enterprise, as the alleged criminal acts were used to further the legitimate business of the companies.

The Court finds that Mr. Panwar has not adequately alleged an association-in-fact enterprise in his Second Amended Complaint, and thus has failed to state a claim under RICO.

Therefore, the Court **GRANTS** Defendants' motion to dismiss Counts I and II of Mr. Panwar's Second Amended Complaint.

**B.      Violations of the TVPA**

Count III of Mr. Panwar's Second Amended Complaint alleges that Defendants violated 18 U.S.C. §1589(a) by obtaining the labor and services of Mr. Panwar and class members by means of the abuse or threatened abuse of law or legal process.  Specifically, Mr. Panwar alleges that Defendants required him to sign a Promissory Note that would require him to pay the Defendants $20,000.00 if he terminated his employment prior to the end of the term of the Employment Agreement, and threatened to revoke his visa if he continued to inquire about his placement or wages.  Defendants argue that Mr. Panwar is merely alleging violations of the INA despite technically pleading under the TVPA.

The factual allegations in Mr. Panwar's complaint sufficiently allege a separate and distinct cause of action for violations of the TVPA.  While the TVPA was primarily designed to "combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions" and to provide "protection and assistance to victims of trafficking," H.R. Conf. Rep. 106-939, at 1 (2000), the threatened harm to the victim is not required to be as serious as the harm typically involved in those forms of human trafficking.   "Trafficking also involves violations of other laws, including labor and immigration codes and laws[.]"  *Id.* at 4.  The fact that Congress explicitly contemplated that the TVPA could apply where a defendant engages a plaintiff in forced labor by means of violations of immigration and labor laws suggests that a victim would not have to exhaust administrative remedies under the INA prior to brining a claim.  However, the plaintiff may not simply re-label a claim based entirely upon allegations that the

defendant violated the H-1B visa program requirements as a TVPA claim; there must be some additional threat of harm involved. *See* 18 U.S.C. § 1589(a).

Additionally, courts have held that threatened financial harm may constitute a type of "serious harm" for purposes of the TVPA. Mr. Panwar cites *Nunag-Tando v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011) as persuasive authority applicable to this case. In *Nunag-Tando*, the plaintiffs were Filipino nationals who worked as teachers in the United States under H-1B visas. When the employees complained to the defendants about their working conditions, the defendants threatened to deport them, allow their visas to expire, terminate them, or sue them, and required them to pay an additional $10,000.00 to remain in the program. In addition, the employees were often indebted for the $5,000.00 "recruitment fee" that they had to pay to the defendants to come to the United States, which they would not be able to pay if they left the teaching job. The court held that the plaintiffs had sufficiently alleged that defendants threatened the abuse of legal process, and that the potential financial harm faced by plaintiffs was sufficiently serious such that their labor was forced as contemplated by § 1589(a). *Id.* at 1146. *See also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("[W]hen Congress amended the [TVPA] it expanded the definition of involuntary servitude to include nonphysical forms of coercion.").

Likewise, in this case, Mr. Panwar alleges that the Defendants used non-physical forms of coercion and threats of serious financial harm to keep him employed with Rehability Care. While the alleged failure to pay Mr. Panwar for non-productive time is technically a violation of the INA, it was the threat of being in debt to the Defendants under the $20,000.00 Promissory Note and having his visa revoked that kept Mr. Panwar from voluntarily terminating his employment, not just the immigration law violation itself. The Court finds that Mr. Panwar has

13

adequately stated a claim under the TVPA, and therefore **DENIES** the Defendants' motion to dismiss Count III.

**C.      Violations of the Indiana Statutory Wage Law**

Count IV of Mr. Panwar's Second Amended Complaint alleges that RN Staff and Access Therapies violated the Indiana Wage Law by failing to pay him and the class members their full wages during their employment.  Again, Defendants argue that this claim falls under the INA for which there is no private right of action.  Indiana Code section 22–2–5–1 provides that an employer "shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee."  I.C. § 22-2-5-1(a).  The statute further provides that "[p]ayment shall be made for all wages earned to a date not more than ten (10) days prior to the date of payment." *Id.*  The Indiana Wage Law is intended to govern not only the frequency, but the amount an employer must pay its employee.  *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002).

Mr. Panwar alleges that he is owed payment for both "benched time" and the amount that he was underpaid based upon the amount agreed upon in the Employment Agreement, the Application and the "prevailing wage" provision of the INA.  However, only the amount due under the Employment Agreement for work actually performed would be subject to the Indiana Wage Payment Statute.  The statute defines "wages" as "all amounts at which the *labor or services rendered* is recompensed . . . ."  I.C. § 22-2-9-1 (emphasis added).  The money owed to Mr. Panwar for benched time is not based upon labor or services rendered; rather, it is an amount that is statutorily mandated under the INA to prevent abuse under the H-1B visa program.  The claim for benched time wages is purely based upon an alleged violation of the INA, so Mr.

Panwar would have to pursue a remedy for this alleged violation through administrative channels with the DOL.

In contrast, the amount that Mr. Panwar alleges he is owed due to underpayment under the terms of the Employment Agreement for work that he did perform does fall within the definition of "wages" under the statute because it is independent of any violations of the INA. The parties agreed to the amount that Mr. Panwar would be paid for his services in the Employment Agreement, and Defendants allegedly failed to pay him that full amount. The underpayment of wages actually earned is logically a situation covered by the Indiana Wage Law. *See Steele*, 766 N.E.2d at 704 n.4 (so long as an employer is in compliance with minimum wage laws, the Indiana Wage Law still applies where the employer and employee have reached a mutual agreement regarding the employee's wage). The Court does not have to determine whether the Defendants violated the INA in order to determine whether Mr. Panwar was paid less than the amount agreed upon in the Employment Agreement. Therefore, the Court **DENIES** the Defendants' motion to dismiss Count IV.

## D.   Breach of Contract Under Indiana Common Law

Count V of Mr. Panwar's Second Amended Complaint alleges that RN Staff and Access Therapies breached their contract with Mr. Panwar and the other class members under Indiana common law. Defendants argue the claim should be dismissed because, if Defendants' motion to dismiss is granted, the Court would lack subject matter jurisdiction over this claim. Because the Court has not dismissed all of Mr. Panwar's federal claims, the Court may still properly exercise supplemental jurisdiction over the state breach of contract claim. *See* 28 U.S.C. § 1367. Defendants also assert that Mr. Panwar has not properly pleaded a class breach of contract claim because he has not shown that the class members' contracts are sufficiently similar. On a motion

to dismiss, the Court accepts the facts pleaded in the complaint as true and views them in light most favorable to Mr. Panwar.  At this stage, the Court need not determine whether the purported class members' contracts are sufficiently similar to warrant class certification.[1]  Therefore, the Court **DENIES** the Defendants' motion to dismiss Count V.

### E.    Unjust Enrichment Under Indiana Common Law

Count VI of Mr. Panwar's Second Amended Complaint is a claim for unjust enrichment under Indiana common law based upon Access Therapies' and/or RN Staff's demand that Mr. Panwar and other class members pay a portion of their visa application fees in violation of the H-1B regulations.  Because this claim directly alleges a violation of the INA, the Court finds that Mr. Panwar must exhaust his administrative remedies with the DOL before he can bring a claim based on his payment of H-1B visa fees in violation of 20 C.F.R. § 655.731.  Therefore, the Court **GRANTS** the Defendants' motion to dismiss Count VI.

### F.    Violation of the Anti-Retaliation Provision of the Fair Labor Standards Act

Count VII of Mr. Panwar's Second Amended Complaint alleges that Defendants violated the anti-retaliation provision of the FLSA with respect to Mr. Panwar individually. After Mr. Panwar filed his original Complaint, he was terminated from his position with Rehability Care.  He then amended his Complaint to add a claim for retaliation under the FLSA. Mr. Panwar alleged in his original Complaint that the Defendants' failure to pay him any wages during non-productive time in violation of 20 C.F.R. § 655(c)(7)(i) is a violation of the FLSA's minimum wage requirement under 29 U.S.C. § 206.

---

[1] The Court notes that Mr. Panwar's breach of contract claim can only be based upon the Employment Agreement, not the terms of the Application.  The Application is an agreement between the employer and the Department of Labor; it is not contractual in nature between the employee and the employer.  *Shibeshi*, 2011 WL 4529455 at *2. Any claims based upon allegations that the Defendants violated the terms of the Application would have to be addressed administratively with the DOL.

The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3).  To state a claim under the FLSA anti-retaliation provision, the plaintiff must allege that he participated in FLSA-protected activity and that he suffered an adverse employment action as a result.  *Kasten v. St. Gobain Performance Plastics Corp.*, 703 F.3d 966, 772 (7th Cir. 2012).  The complaint must be related to conduct regulated by the FLSA, not just a general complaint about wages.  *Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp. 2d 682, 690 (E.D. Wis. 2007).

The Court finds that Mr. Panwar's claim that failure to pay him at least minimum wage for non-productive time does not constitute an FLSA violation.  Mr. Panwar argues that the INA incorporates the FLSA by reference in 20 C.F.R. § 655.731(c)(7)(i).  This subsection addresses wage obligations for H-1B employees in non-productive status, and the end of this provision states that H-1B employees must be paid the required wage as defined by the FLSA "for all hours *performing work*."  20 C.F.R. § 655.731(c)(7)(i) (emphasis added).  There is no reference to the FLSA with regard to payment for non-productive time in the INA regulations, nor is payment for non-productive time a right that is protected by the FLSA; the regulation specifically refers to "hours performing work."  *Id.*  There is also no indication that this reference was intended to permit H-1B employees to assert an FLSA claim for any other INA violation. The right to payment for non-productive time is a right that is bestowed to H-1B employees under the INA, so any failure to pay such wages would be a violation of the INA, not the FLSA. Because Mr. Panwar's original Complaint did not allege a violation of an FLSA protected right,

his retaliation claim also fails as a matter of law.  Therefore, the Court **GRANTS** Defendants'
motion to dismiss on Count VII.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss (Dkt. 68) is **GRANTED in
part and DENIED in part.**  The Motion to Dismiss is **GRANTED** on Counts I, II, VI, and VII,
and **DENIED** on Counts III, IV, and V.  Counts I, II, and VI are **DISMISSED without
prejudice**, and Count VII is **DISMISSED with prejudice**.


**SO ORDERED.**

Date: _09/30/2013_____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

G. John Cento
CENTO LAW LLC
cento@centolaw.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN &
SIMMONS
awirick@humesmith.com

Daniel Aaron Kotchen
KOTCHEN & LOW LLP
dkotchen@kotchen.com

Justin T. Ervin
KOTCHEN & LOW LLP
jervin@kotchen.com

Eamon F. Redmond
KOTCHEN & LOW, LLP
eredmond@kotchen.com

Michael F. Brown
PETERSON BERK & CROSS, S.C.
mbrown@pbclaw.com

Jeffrey B. Fecht
RILEY BENNETT & EGLOFF LLP
jfecht@rbelaw.com

Bryce H. Bennett, Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

18