UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RITURAJ SINGH PANWAR, and <br> MICHAEL RICHARD BAUTISTA AGUSTIN, <br> on behalf of themselves <br> and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ACCESS THERAPIES, INC., RN STAFF, INC., <br> d/b/a REHABILITY CARE, RAMON VILLEGAS, <br> MANUEL GARCIA, and HARVINDER DHANI <br><br> Defendants. | Case No.: 1:12-cv-00619-TWP-TAB <br><br> **CLASS ACTION** |

**MEMORANDUM IN SUPPORT OF MOTION FOR
WITNESS TAMPERING AND DISCOVERY MISCONDUCT SANCTIONS**

Plaintiffs Rituraj Panwar and Michael Agustin ("Plaintiffs"), and all others similarly situated, through their undersigned attorneys, move the Court, pursuant to Federal Rule of Civil Procedure 37(b) and the Court's inherent powers, for an Order entering a default judgment. This Court previously determined, with respect to prior discovery conduct, that Defendants acted in bad faith. (Report and Recommendation Dated January 19, 2014, Dkt. 155, pp. 9-10). Now Plaintiffs have learned Defendants also engaged in witness tampering – calling H-1B employee witnesses to tell them to "ignore" a Court-ordered e-mail production request – conduct that amounts to fraud on the Court and warrants the harsh sanction of default judgment on the issue of liability. If the Court does not enter default judgment, in the alternative, Plaintiffs seek that the Court order that the validity date set forth in each H-1B employee's initial I-797 Approval form shall establish the date upon which each H-1B employee's employment began and the date upon which Defendants' wage obligations to the employee began.

## BACKGROUND

*A. Case Overview*

This case involves a scheme in which Defendants profit from an immigrant labor force who Defendants underpay and hold captive through the threat of substantial financial contract penalties if they quit and the potential loss of their H-1B visas. Defendants underpay H-1B employees in one of two ways: (1) they do not pay employees when Defendants have no paid work to assign employees (including when employees first start their employment);[1] and (2) even when they have paid work, Defendants do not pay employees their contracted rate of pay.[2]

If an H-1B employee seeks to quit, he or she faces significant risk of a lawsuit in which Defendants seek to enforce the liquidated damages clause of their contract and promissory notes – *e.g.*, they threaten that "it would 'cost you high to leave us.'" Libertino Declaration (Ex. 2), ¶ 10; *see also* Abad Declaration (Ex. 4), ¶ 8; Licupa Declaration (Ex. 1), ¶ 10; 3rd Am. Compl. ¶¶ 53-54. In addition, if an H-1B employee wants to complain or quit to avoid wage loss, he or she faces potential loss of visa status. Licupa Declaration (Ex. 1), ¶ 7; 3rd Am. Compl. ¶ 40.

As a result, H-1B employees feel captive to Defendants and cannot quit. Libertino Declaration (Ex. 2), ¶ 10-11; Licupa Declaration (Ex. 1), ¶ 7; Abad Declaration (Ex. 4), ¶ 8; Kumar Declaration (Ex. 3), ¶ 7. Indeed, H-1B employees seem to live a state of fear of retaliation. *See, e.g.,* Anonymous E-mail, Feb. 16, 2014 (Ex. 5) ("i am afraid if I will take any action against them they may revoke my H1B and my green card petition. because of these reasons i like to keep my name unanimous [anonymous]"); Anonymous E-mail, Feb. 19, 2014 (Ex. 6) ("I WOULD LIKE TO TALK TO YOU ABOUT SAME REGARDS, BUT I CAN NOT

---

[1] *See, e.g.*, Licupa Declaration (Ex. 1), ¶¶ 3-6, 8; Libertino Declaration (Ex. 2), ¶ 11; Kumar Declaration (Ex. 3), ¶ 4; 3rd Am. Compl. ¶¶ 38-41, 48-50, 53 (Dkt. No. 161).

[2] *See, e.g.*, Abad Declaration (Ex. 4), ¶ 4; Kumar Declaration (Ex. 3), ¶ 4; 3rd Am. Compl. ¶¶ 42, 51-52, 56.

AT THIS TIME AS I HAVE FEW MORE MONTHS TO WORK WITH THEM BECAUSE THEY CAN WITHDRAW MY GREEN CARD PETITION AS WELL AS CUT MY HIB prior to that.").

H-1B employees' fear of retaliation is well founded. Defendants have filed over 50 lawsuits against individuals in Marion County Court. *See* Sanctions Motion Ex. P (Dkt. 98-17, Marion County Court Docket List). Mr. Mendoza was sued 11 days after Plaintiffs filed his declaration with the Court. (Dkt. 120-2, Defendants' Marion County Complaint against Mr. Mendoza); *see also* Licupa Declaration (Ex. 1) ¶¶ 10-11 ("I ended my employment with Access Therapies on February 8, 2011. Access Therapies sued me in April 2011 in Marion County Court, seeking at least $13,000 for breach of contract").

B. *Defendants' Discovery Misconduct and Witness Tampering*

Since mid-2012, Plaintiffs' counsel have actively sought discovery from Defendants and have been concerned about discovery misconduct by Defendants. *See* R&R (Dkt. 155), at 2-4. On October 16, 2012, Defendants were ordered to produce responsive documents by November 20, 2012, a deadline that was subsequently extended to November 28, 2012. *Id.*, p. 3.

Defendants' November 28, 2012 document production was woefully incomplete. Notably, by November 28, aside from e-mails involving Plaintiff Panwar, Defendants had produced almost no e-mails with other H-1B employees, producing merely 12 e-mails involving four other workers. *See* Dhani 30(b)(6) Depo. Tr., at 32:4-11 (Ex. 7). In addition to documenting any worker complaints about Defendants' underpayment of wages, e-mails are important to establish the date on which H-1B employees start with Defendants – *i.e.*, that they

were in the United States ready and able to work at the time of their H-1B visa approval date.[3] *See, e.g.*, Agustin Decl. Ex. T (Dkt. 100-1) (sample e-mails from Mr. Agustin that Defendants did not produce, including e-mails near the beginning of his employment indicating his availability to start work for Defendants, and e-mails in which he was complaining to Defendants about their failures to pay him required wages).

On January 9, 2013, Plaintiff took a 30(b)(6) deposition of Defendants to address Defendants' "efforts to preserve, collect, and produce documents." R&R at 3. Defendants' representative Harvinder Dhani testified that all files for past and present employees were searched, and all responsive e-mails produced to Plaintiff Panwar. Dhani 30(b)(6) Depo. Tr., 31:8-16 (Ex. 7). When asked why the Defendants had produced a total of 12 e-mails from four different H-1B employees (other than from Mr. Panwar), Defendants testified that they tend not to communicate with H-1B employees by e-mail and that their communications are typically "done through the phones" where "there's no written record." *Id.*, at 27:14-25. Mr. Dhani emphasized that, "[i]t's what we gave you all that right there." *Id.*, at 32:23-24. Defendants further explained that, in addition to phone calls, H-1B employees would go to Kinkos to send faxes:

> Q: So if I understand you correctly, you're saying that only those four H-1B employees ever e-mailed?
>
> A: It was all phone calls[.] . . . Most of these people when they come in they don't have computers right away. So it's all by phone most of the time, and they have to go to Kinko's or

---

[3] The I-9 forms also list an employee start date, which Defendants themselves fill in. Plaintiffs have discovered that Defendants do not list in I-9 forms the start dates that employees begin work with Defendants, but use a date that coincides with when Defendants find paid work for the employees. *See, e.g.*, Dkt. 1-2 (e-mail communication April 8, 2011 near Plaintiff Panwar's actual start of availability); Panwar I-797 (Ex. 8), p. 2 (showing a validity date of April 5, 2011); Panwar I-9 (Ex. 8), p. 1 (Defendants indicated "12/5/11" as start date, which coincides with December 5, 2011 date when Mr. Panwar started his first paid client assignment).

> somewhere else to fax their stuff over. So there's not that many e-
> mails.

*Id.*, 33:8-19.

Following this deposition, Plaintiff Panwar continued to have serious concerns about Defendants' document search and production efforts. Plaintiff suspected what has now since been repeatedly confirmed: Defendants in fact *extensively* communicated with H-1B employees by e-mail, including e-mails concerning non-payment or underpayment of wages. Libertino Declaration (Ex. 2), ¶ 3; Licupa Declaration (Ex. 1), ¶ 9; Kumar Declaration (Ex. 3), ¶ 5; Abad Declaration (Ex. 4), ¶ 5; Mendoza Declaration (Dkt. 112-1), ¶ 2; Agustin Declaration (Dkt. 100), ¶¶ 2-4.

On February 13, 2013, the Court ordered, among other things, that Defendants' counsel send an e-mail to all Defendants' H-1B employees asking that the employees send to counsel "all e-mails sent to or received from Access Therapies or RN Staff, Inc. executives or employees" and that the counsel then "follow up with each H-1B employee to supervise the collection of such e-mails[.]" Feb. 13, 2013 Order (Dkt. 87). Defendants waited over two months to send the required e-mail notice, and only did so (on April 26, 2013) after Defendants were informed (on April 15, 2013) that Plaintiff intended to file a motion for sanctions.[4] *See* Brown Declaration, Ex. R (Dkt. 99-1); Dkt. 103-3 (Mr. Cento's e-mail). Mr. Cento's e-mail was sent to 84 employees.[5]

---

[4] In opposing Plaintiff's motion for sanctions, Defendants repeatedly argued that they had produced all responsive e-mails. *See, e.g.*, Defendants Opposition to Plaintiff's Motion for Sanctions (Dkt. No. 103), p. 9 ("Defendants maintain they have produced all the e-mails in their possession and control. It is axiomatic that Defendants cannot produce e-mails which they do not possess.").

[5] Not all H-1B employees received Mr. Cento's e-mail. Mendoza Declaration (Dkt. 112-1) ¶ 3.

5

Plaintiffs have now learned Defendants tampered with H-1B worker-witnesses who were sent Mr. Cento's e-mail. Shortly after Mr. Cento sent the e-mail to H-1B employees, Defendants called employees and instructed that the employees "ignore" the e-mail and not produce any documents. Specifically, Arlin Libertino indicated that, shortly after she received Mr. Cento's e-mail, Tess Mabesa from Defendants called Ms. Libertino and instructed her that "if [I] happen to receive an e-mail from an attorney, just ignore it, don't respond." Libertino Declaration (Ex. 2), ¶¶ 6, 8. Ms. Mabesa serves as a contact person for Defendants' immigration and visa-related matters and Ms. Libertino followed her instruction not to respond to the e-mail. *Id.* Similarly, Dante Abad indicated that, shortly after he received Mr. Cento's e-mail, Ms. Mabesa called Mr. Abad and stated that, with regard to the e-mail, he should "just ignore it, [he doesn't] need to respond to it." Abad Declaration (Ex. 4), ¶ 7. Mr. Abad followed her instructions. *Id.*

Defendants' instruction to employees to "ignore" Mr. Cento's e-mail helps explain why – out of the 84 employees who received Mr. Cento's e-mail – Defendants produced only 16 e-mails from a single H-1B employee (Brian Dixon). *See* Brown Declaration (Dkt. 109), ¶ 10. Considering that Defendants typically communicate by e-mail with H-1B employees about wages and other issues, Defendants' instruction clearly had its intended effect: they have successfully thwarted Plaintiffs' and the Court's longstanding effort to obtain production of e-mails from the H-1B workers subject to Defendants' forced labor scheme.

## ARGUMENT

I. **Defendants' Conduct Warrants a Default Judgment under the Court's Inherent Powers and/or Rule 37(b).**

"Trying improperly to influence a witness is fraud on the court and on the opposing party." *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008). Witness tampering interferes with the Court's ability to function properly. *Ramsey v. Broy*, No. 08-CV-0290-MJR-

6

DGW, 2010 WL 1251199, *4 (S.D. Ill. Mar. 24, 2010) (citing 18 U.S.C. § 1512(b)). Section 1512(b) defines witness tampering as corruptly persuading (or attempting to persuade), or engaging in misleading conduction toward another person, "with intent to cause or induce any person to … withhold a record, document, or other object, from an official proceeding." 18 U.S.C. § 1512(b)(2)(A). Witness tampering "deserves that harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process." *Ramsey*, 2010 WL 1251199, at *4. The Court need not "measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (affirming dismissal of suit where wrongdoer violated attorneys' eyes only agreement, among other misconduct).

Throughout this litigation, Defendants have acted in bad faith to obstruct discovery and disobey this Court's orders. *See* R&R at 8-10. Defendants' effort to flagrantly defy this Court's February 13, 2013 Order by instructing H-1B employees to "just ignore [Mr. Cento's e-mail], don't respond," constitutes witness tampering. Undeniably, Defendants acted with intent to induce potential witnesses to "withhold a record, document, or other object" from this litigation. 18 U.S.C. 1512(b); Libertino Declaration (Ex. 2), ¶ 8; Abad Declaration (Ex. 4), ¶ 7. Defendants have committed fraud on the Court, and their conduct warrants default judgment. *Ramsey*, 2010 WL 1251199, at *5 ("The Seventh Circuit has consistently condemned witness tampering, suggesting that the practice deserves the Court's harshest sanction") (citing *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 537 (7th Cir. 2003); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1178-79 & n. 15 (3d Cir. 1993); *Weibrecht v. S. Ill. Transfer, Inc.*, 241 F.3d 875, 884 (7th Cir. 2001)).

While the Court need not "measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction," Plaintiffs have been severely prejudiced by

Defendants' misconduct. *Ramsey*, 2010 WL 1251199, at *6 (ordering default judgment as sanction for *attempted* witness tampering) (citing *Salmeron*, 579 F.3d at 797).[6] The success of Defendants' efforts to obstruct discovery in this case are plainly evident. Though Mr. Cento e-mailed 84 H-1B individuals, only a single individual responded and provided a mere 16 e-mails. Other than e-mails with Mr. Panwar, Defendants' e-mail production has been scant this entire litigation. On behalf of Defendants, Mr. Dhani testified that almost all their communication with field employees is "done through the phones," where "there's no written record." Dhani 30(b)(6) Depo. Tr. at 27:14-25 (Ex. 7).

Mr. Dhani's testimony was plainly false. Ms. Libertino, Ms. Licupa, Ms. Kumar, Mr. Abad, Mr. Mendoza, and Mr. Agustin have indicated that they *extensively* corresponded with Defendants via e-mail. Libertino Declaration (Ex. 2), ¶ 3; Licupa Declaration (Ex. 1), ¶ 9; Kumar Declaration (Ex. 3), ¶ 5; Abad Declaration (Ex. 4), ¶ 5; Mendoza Declaration (Dkt 112-1), ¶ 2; Agustin Declaration (Dkt. 100), ¶¶ 2-4. As described, some of these e-mail communications concerned start of employment, wage disputes, contract negotiations, requests for assignments during benched periods, and other matters centrally relevant to this case. This Court has recognized the relevance of e-mail in determining class member start dates. R&R at 10. E-mails are also relevant in identifying class members, determining their employment and wage liability start dates, calculating damages, and revealing the scope and breadth of Defendants' forced labor scheme. Accordingly, Defendants' intentional, bad faith efforts to tamper with witnesses and defraud the Court warrant default judgment. *See, e.g.*, *Young v.*

---

[6] Unlike in *Ramsey*, in which the guilty party's attempted witness tampering was discovered in time to prevent harm to the innocent party, Defendants' tampering has been almost completely effective at preventing Plaintiffs from obtaining e-mail evidence. *Compare Ramsey*, 2010 WL 1251199, at *6 ("Granted, thanks to [the witness's] good sense, Ramsey only *attempted* to tamper with witnesses without actually getting that witness's tampered testimony on the record") *with* Libertino Declaration (Ex. 2) ¶ 8; Abad Declaration (Ex. 4), ¶ 7.

*Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 70-71 (D.D.C. 2003) (ordering dismissal of action for witness tampering and finding lesser sanctions, including monetary sanctions, a protective order, issue-preclusion, and civil-contempt inadequate to redress the abuse of the legal system); *Vargas v. Peltz*, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) ("Dismissal is appropriate where 'a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter … or unfairly hampering the presentation of the opposing party's claim or defense") (citation omitted).

Alternatively, default is warranted under Federal Rule of Civil Procedure 37(b). Rule 37(b) permits the Court to sanction a party for failing to "obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Under Rule 37(b), the Court may "designat[e] facts [to] be taken as established for the purposes of the action," and "render[] a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(i), (vi). The Seventh Circuit has found default (or dismissal) appropriate when there is "a finding of willfulness, bad faith or fault." *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003); *Hindmon v. National-Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 620 (7th Cir. 1982) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976) (per curiam)). Bad faith is "conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order." *Marrocco v. General Motors*, 966 F.2d 220, 224 (7th Cir.1992).

Defendants were already found to have acted in bad faith with respect to a prior motion and discovery issues. R&R at 9-10. Little question exists that Defendants' actions described herein were also taken in bad faith and with intent to obstruct the discovery process and in violation of the Court's February 13, 2013 Order. In context of Defendants' other discovery violations, *see* R&R at 8-10, Defendants' instructions that H-1B workers ignore Mr. Cento's e-

mail is particularly egregious and prejudicial. It undermined the whole purpose of the Order, which was to allow an alternative route of production of e-mails that Defendants failed to produce under suspect rationales such as a claimed e-mail server "crash" and Defendants' claim they hardly ever communicate by e-mail. R&R at 8. This constitutes an intentional "pattern of noncompliance," including perjured testimony and witness tampering, and thereby warrants the harshest sanctions. *See Newman v. Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591-92 (7th Cir. 1992) (upholding dismissal of claims where party repeatedly missed deadlines, did not appear for a deposition, and failed to provide documentation of financial distress). Given Defendants' demonstrated willingness to subvert the judicial process, there is no reason to believe that a lesser sanction than default would correct their behavior. Moreover, any corrective notice to putative class members would be unlikely to correct the damage Defendants' conduct has caused. Defendants have succeeded in creating a culture of fear of retribution for any actions taken against the company. In this context, any lesser sanction than default would be inappropriate.

## II. If Default Judgment is Not Granted, In the Alternative, The Court Should Order That H-1B Employees Are Deemed to Have Started Employment Upon Their I-797 Validity Date.

As this Court has already recognized, Defendants' failure to produce e-mail has hampered Plaintiffs' ability to establish the dates on which putative class members started to work and when their wage liability began. R&R at 10. Accordingly, Defendants should not be allowed to contest the fact that their H-1B employees started work, and that Defendants' wage obligations began, upon their initial I-797 Approval forms' validity dates. To secure employment approval for an H-1B employee, Defendants must file an I-129 Petition for A Nonimmigrant Worker with USCIS in which they fill-in an intended employment start date. *See*

8 CFR 214.2 (9)(ii). This intended employment start date is reflected on an approved I-797 Approval form as the "validity date." *See, e.g.*, Panwar I-797 (Ex. 8), p. 2. H-1B employees also sign contracts with Defendants, and therefore obligate themselves to work for Defendants, prior to the I-797 approval date. *See, e.g.*, Panwar Contract (Ex. 9). Thus, it makes sense that the I-797 validity date represents the date on which H-1B employees begin working for Defendants, as this is the first date the employees are allowed to start their work, the date on which the employer indicated the employee would begin work, and the date on which the employees are presumed to begin work under federal regulations. *See* 8 CFR 214.2 (9)(ii).

Rule 37(b)(2)(A)(i) permits the Court to impose a sanction "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A)(i). In assessing this sanction, the Court must consider the following factors: "(1) culpability (including willfulness and bad faith, and whether the client was responsible or solely the attorney); (2) prejudice; and (3) whether lesser sanctions would have been effective." *United Consumers Club, Inc. v. Prime Time Marketing Management Inc.*, 271 F.R.D. 487, 502 (N.D. Ind. 2010) (citation omitted). Each of these factors is satisfied in this case.

First, Defendants' misconduct, instructing employees not to respond to Mr. Cento's e-mail, was done intentionally and in bad faith. Second, Defendants' conduct resulted in significant prejudice to Plaintiffs. Missing e-mails are needed to corroborate employee start dates (near the time of their I-797 Approval form validity dates), as well as identifying class members, calculating damages, and revealing the scope and breadth of Defendants' forced labor scheme. Moreover, Defendants' actions have caused extensive delays in this case, requiring multiple revisions to the Case Management Plan and a discovery period that has now extended

over one and half years. *See* Order dated March 11, 2014, Dkt. 164 (granting Motion to Adopt Amended Case Management Plan, rescheduling case deadlines and trial). Third, a lesser sanction cannot cure the prejudice for Defendants' willful misconduct. Defendants' actions have ensured that Plaintiffs and the Court do not have critical documents relevant to class certification and liability. Moreover, Defendants have succeeded in creating a culture of fear of retribution for any actions taken against the company.

## CONCLUSION

For the reasons stated above, default judgment should be entered against the Defendants, or if default is not granted, in the alternative, the Court should order certain facts established, as referenced above.

Date: March 17, 2014   /s/ Michael Brown
Michael Brown
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
Phone: (920)238-6781
Email: mbrown@dvglawpartner.com

Daniel Kotchen
KOTCHEN & LOW, LLP
1745 Kalorama Road, NW, Suite 101
Washington, DC 20009
Phone: (202) 468-4014
Email: dkotchen@kotchen.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS
54 Monument Circle
4th Floor
Indianapolis, Indiana 46204
Phone: (317) 632-4402
Email: awirick@humesmith.com

Vonda K. Vandaveer
V.K. Vandaveer, P.L.L.C.

P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com