**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| RITURAJ SINGH PANWAR and MICHAEL RICHARD BAUTISTA AGUSTIN, on behalf of themselves and all other similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ACCESS THERAPIES, INC., RN STAFF, INC., d/b/a REHABILITY CARE; HARVINDER DHANI; MANUEL GARCIA; and RAMON VILLEGAS, )<br><br>Defendants. ) | No: 1:12-CV-00619-TWP-TAB |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

Defendants, by counsel, and submit this Memorandum in Support of their Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint (the "**Complaint**"). Plaintiffs' Complaint fails to state a claim upon which relief can be granted and, for the reasons set forth herein, should be dismissed in its entirety.

### I. LEGAL STANDARD

When reviewing a 12(b)(6) motion, the Court takes all well-pleaded allegations in the complaint as true and draws all inferences in favor of the Plaintiffs. Bielanski v. Cnty. of Kane, 550 F.3d 632, 633 (7th Cir. 2008) (citations omitted); Fed. R. Civ. P. 12(b)(6). However, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Pisciotta v. Old Nat'l Bancorp, 499 F. 3d 629, 633 (7th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)). Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." Hecker v. Deere & Co., 556 F.3d 575, 580 (7th Cir. 2009) (citations omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). Additionally, the court is not required to accept the plaintiffs' legal conclusions in their complaint as true. Id.

## II. DISCUSSION

### A. SUBJECT MATTER JURISDICTION

Plaintiffs' claim this court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 (federal question) and 28 U.S.C. 1332 (diversity jurisdiction). Finally, Plaintiff claims that jurisdiction over Plaintiff's claims under Indiana law are appropriate pursuant to 28 U.S.C. 1367. As set forth below, Plaintiffs' federal claims should be dismissed. If those claims are dismissed, the only remaining basis for subject matter jurisdiction would be diversity.

The settled rule for a party seeking to establish tradition diversity jurisdiction is that when two or more plaintiffs having "separate and distinct" claims unite in a single suit, it is essential that the claim of each exceed the minimum jurisdictional amount. Only in the comparatively rare situation when several plaintiffs unite to enforce a single title or right in which they have a "common and undivided interest" will the courts consider the value of their interests collectively. In all other circumstances, aggregation of many smaller claims to meet the amount is not permitted. See, e.g., Travelers Prop. Cas. v. Good, 689 F.3d 714, 721 (7th Cir. 2012) (claims of co-parties are "common and undivided" and thus may be aggregated only if each claim (1) is part of a "common

fund" and (2) could not be adjudicated on an individual basis without affecting the interests of the other claimants); see also Gibson v. Chrysler Corp., 261 F.3d 927, 943–945 (9th Cir. 2001) (class members may aggregate claims only when plaintiffs unite to enforce single title or right in which they have common and undivided interest); Smith v. GTE Corp., 236 F.3d 1292, 1300–1303, 1309–1310 (11th Cir. 2001) (compensatory damages and unjust enrichment claims against telephone service provider based on alleged scheme to defraud customers could not be aggregated because they arose from customers' individual agreements with provider; value of injunctive relief could not be aggregated because relief would protect rights stemming from individual lease agreements).

Plaintiffs' assertion of diversity is premised upon the allegation that "the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." Plaintiffs' Third Amended Complaint ("**Complaint**"), at 11. Plaintiffs' have not sufficiently plead diversity jurisdiction because Plaintiffs have neither plead their individual claim amount and have not plead (and could not show even if they had plead) that the claims at issue are "common and undivided." According, this Court cannot exercise diversity jurisdiction over this case.

Accordingly, should the Court dismiss Plaintiffs' federal claims, the Court would have no remaining basis upon which to exercise supplemental jurisdiction over the remaining Indiana statutory and common law claims and, therefore, should dismiss the entire matter.

**B.    CLAIMS UNDER THE TVPA**

Plaintiffs allege that Defendants employed a "forced labor scheme" to "economically deprive foreign employees, cause them serious financial harm, and restrict their ability to leave employment" by: (1) "threat of visa loss"; (2) "promissory note penalty"; and (3) "other serious harms." Complaint, at 1. Plaintiff's claim that this conduct violated: the Trafficking Victims Protection Act, 18 U.S.C., §§ 1589-90, 1593, 1595 (the "**TVPA**") (Count I); the Indiana Statutory Wage Law, Ind. Code 22-2-5-2 (Count II); and constitutes breach of contract (Count III).

This Court has already held in this case in ruling on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint that "While the alleged failure to pay Mr. Panwar for non-productive time is technically a violation of the INA, it was [1] the threat of being in debt to the Defendants under the $20,000.00 Promissory Note and [2] having his visa revoked that kept Mr. Panwar from voluntarily terminating his employment, not just the immigration law violation itself." Consequently, the Court found that Mr. Panwar had adequately stated a claim under the TVPA. Defendants raise these issues again here by asking to Court reconsider its prior ruling in light of the arguments raised for the first time below.

1. **Alleged Threats of Visa Loss**

Plaintiffs allege that "Defendants used the threat of deportation … to prevent Plaintiffs from voluntarily terminating their employment, seeking alternative employment, and/or objecting to their under or non-payment, even during periods of benched time. Complaint, at 18. Plaintiffs further allege that "Defendants are able to force these H-1B employees to remain in positions during unpaid benched periods through threats of deportation." Complaint, at 29.

An H-1B worker's status in the US is contingent upon their continued employment. If an H-1B employee resigns from their position or is terminated, they are out of status for immigration purposes as of their last date of employment. As Plaintiffs' Complaint readily admits as much: "An H-1B visa is valid only as long as an employer who petitioned the government for an H-1B visa employs the H-1B employee. If the H-1B employer terminates the employee, the employee loses his immigration status. The employee typically has to return to his home country unless another employer receives an H-1B visa for the employee on or about the time the employee is terminated or the employee otherwise obtains another valid immigration status." Complaint, at 19. This is more than an admission, it is a correct statement of federal immigration law. Furthermore, an employer of H1B workers has affirmative duties under federal immigration law when an employee resigns or is terminated.

When an employer files an H-1B petition with the U.S. Citizenship & Immigration Services, the employer takes on a number of obligations pursuant to the LCA and immigration and Department of Labor regulations. If an H-1B employee stops working prior to the expiration of their authorized stay in H-1B status, the employer must take steps to end their obligations, failure to do so may result in penalties including wages owed to employees even after their employment has ended.

Specifically, 20 CFR 655.731(c)(7)(ii) (Circumstances where wages need not be paid) provides that:

> If an H-1B nonimmigrant experiences a period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile accident which temporarily incapacitates the nonimmigrant), then the employer shall not be obligated

to pay the required wage rate during that period, provided that such period is not subject to payment under the employer's benefit plan or other statutes such as the Family and Medical Leave Act (29 U.S.C. 2601 et seq.) or the Americans with Disabilities Act (42 U.S.C. 12101 et seq.). Payment need not be made if there has been a bona fide termination of the employment relationship. **DHS regulations require the employer to notify the DHS that the employment relationship has been terminated so that the petition is canceled (8 CFR 214.2(h)(11)), and require the employer to provide the employee with payment for transportation home under certain circumstances (8 CFR 214.2(h)(4)(iii)(E))**.

8 CFR 214.2(h)(11) (Revocation of approval of petition) provides that:

(i) General. (A) **The petitioner shall immediately notify the Service of any changes in the terms and conditions of employment** of a beneficiary which may affect eligibility under section 101(a)(15)(H) of the Act and paragraph (h) of this section. An amended petition on Form I-129 should be filed when the petitioner continues to employ the beneficiary. **If the petitioner no longer employs the beneficiary, the petitioner shall send a letter explaining the change(s) to the director who approved the petition.** However, H-2A and H-2B petitioners must send notification to DHS pursuant to paragraphs (h)(5)(vi) and (h)(6)(i)(F) of this section respectively. (B) The director may revoke a petition at any time, even after the expiration of the petition.

(ii) Immediate and automatic revocation. The approval of any petition is immediately and automatically revoked if the petitioner goes out of business, files a written withdrawal of the petition, or the Department of Labor revokes the labor certification upon which the petition is based.

(iii) Revocation on notice -- (A) Grounds for revocation. The director shall send to the petitioner a notice of intent to revoke the petition in relevant part if he or she finds that: (1) **The beneficiary is no longer employed by the petitioner in the capacity specified in the petition**, or if the beneficiary is no longer receiving training as specified in the petition; or (2) The statement of facts contained in the petition or on the application for a temporary labor certification was not true and correct, inaccurate, fraudulent, or misrepresented a material fact; or (3) The petitioner violated terms and conditions of the approved petition; or (4) The petitioner violated requirements of section 101(a)(15)(H) of the Act or paragraph (h) of this section; or (5) The approval of the petition violated paragraph (h) of this section or involved gross error. (B) Notice and decision. The notice of intent to revoke shall contain a detailed statement of the grounds for the revocation and the time period allowed for the petitioner's rebuttal. The petitioner may submit evidence in rebuttal within 30 days of receipt of the notice. The director shall consider all relevant evidence presented in

deciding whether to revoke the petition in whole or in part. If the petition is revoked in part, the remainder of the petition shall remain approved and a revised approval notice shall be sent to the petitioner with the revocation notice.

Accordingly, if an H-1B worker resigns or is terminated, the Employer **must** withdraw the Labor Condition Application filed with the Department of Labor and notify the USCIS in writing that the H-1B employee no longer works for the company so that the USCIS has an opportunity to revoke the underlying H-1B petition.

Plaintiffs' Complaint makes reference to two so-called "threats" allegedly made by Defendants regarding Mr. Panwar's visa. Specifically, Plaintiff alleges that:

- In June 2011, in response to Mr. Panwar's daily calls and e-mails inquiring about the status of his job placement, Mr. Villegas - on behalf of Access Therapies - made an interstate phone call to Mr. Panwar and **threatened to revoke his H-1B visa if he kept asking about his placement or his due wages**. Complaint, at 40.

- On May 9, 2012, Defendants were served with Mr. Panwar's original Complaint, Mr. Ramon Villegas, acting as a representative and/or employee of Defendant Access Therapies and Defendant RN Staff, Inc., d/b/a Rehability Care, left Mr. Panwar voice messages threatening to terminate his employment and revoke his visa because he had made "a very wrong move" in filing his legal complaint. In the message, Mr. Villegas stated "Hi Raj, this is Ramon Villegas of Access Therapies... They're asking me to give you a call and let you know **if you do not give us a call back in the office, we'll be forced to cancel your visa effective tomorrow**... I hope you understand that we did our part to help you. And going this route, it's a very wrong move on your part... Please don't do this. Give me a call back in the office…"

Let us consider the first alleged threat; namely that Mr. Villegas threatened to "revoke [Mr. Panwar's] H-1B visa if he kept asking about his placement or his due wages." According to the Complaint, this threat was made because Mr. Panwar was making "daily phone calls and emails" to Mr. Villegas. Obviously, Mr. Villegas does not have the authority or the ability to actually deport Mr. Panwar. Therefore, according to Mr. Panwar, Mr. Villegas was making a threat he could not actually make good on. However, although not expressly stated, the only implication to be drawn from these alleged facts is that Mr. Panwar's daily phone calls and emails bothered Mr. Villegas to the point that Mr. Villegas presumably considered terminating Mr. Panwar's employment. According to federal immigration law, in the event of termination, RN Staff would have no choice but to report the fact of his termination to DHS. DHS in turn would be required by law to immediately revoke Mr. Panwar's visa. These actions would have the effect of requiring Mr. Panwar to leave the country or risk deportation. This is exactly how immigration law works. An H1B employee must remain employed to remain in the country. Moreover, RN Staff is not obligated to keep Mr. Panwar employed. Like any other employee, he can be terminated, including for reasons such as making daily phone calls and emails complaining about his employment.

The second alleged so-called "threat" made by Mr. Villegas occurred when Mr. Villegas called Mr. Panwar to let him know that if Mr. Panwar did not return his employer's phone calls, his employer would be "**forced to cancel [his] visa**." Again, it is axiomatic that RN Staff does not have the authority to "cancel" Mr. Panwar's visa; just as RN Staff did not have the authority to issue it in the first place. The only meaning which can be ascribed to this statement is that if Panwar did not call his employer as

requested, his employer would terminate his employment. Again, upon termination, RN Staff would be obligated to immediately notify the DHS which would result in revocation of Mr. Panwar's visa. While termination is certainly a choice available to RN Staff, notification of the DHS is not. RN Staff and Mr. Villegas cannot be rightfully accused of using the threat of visa cancellation improperly in violation of the TVPA, if they are simply doing that which they have the right to do (terminate Mr. Panwar's employment) and that which they are obligated to do pursuant to federal immigration law once that termination occurs (notify the DHS to initiate the visa revocation process). In other words, this is not forced labor by threatening the *abuse* of legal process because there is no abuse here. It cannot be abuse of process for an employer to exercise its right to terminate an employee and then comply with its legal obligations to report that termination to the DHS. It is this lack of *abuse* that begins distinguishes this case from the persuasive authority, Nunag-Tando v. E. Baton Rouge Parish Sch. Bd., 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011), offered by Plaintiff in opposition to Defendants' first motion to dismiss; authority which this Court ultimately relied upon.

Nunag-Tando is distinguishable for other reasons as well. The Nunag-Tando court began its analysis by finding that:

> After the worker joins the program and begins employment, the worker becomes unhappy. But if the worker quits, awaiting is a trip home with a massive amount of debt that will be impossible to repay. Working in the program is the only way to repay the loan. Is this forced labor? Fraud? No. It is a bargained-for exchange. Despite the worker's unhappiness, the terms and costs of the program were known, and the worker voluntarily obtained the loan to join the program. The worker's eventual discontent does not transform the valid contract with the recruiters into something illegal.

Nunag-Tando, 790 F.Supp.2d at 1136. The facts in Nunag-Tando which altered the court's initial conclusion were that:

> After the worker made the payment, the recruiters alter the program terms and costs? The recruiters demand an additional payment of double what the worker has already paid. They threaten to kick the worker out of the program if additional payments aren't made, and they keep the initial payment even if the worker decides to leave to program. The worker is therefore faced with a choice of forfeiting the first payment, knowing that repayment of the debt may be impossible, or paying the additional money the recruiters now demand. Knowing that working in this program is the only way to repay the initial debt, the worker pays the additional sum and continues working in the program.

Nunag-Tando, 790 F.Supp.2d at 1136. In other words, the distinguish fact was that the employer altered the program terms and costs after the employee made his initial payment by demanding more money not originally bargained for as a term of employment. Plaintiffs make no such allegations in this case. Accordingly, this Court should not be persuaded by Nunag-Tando.

**2.      Alleged Promissory Note Penalty**

Plaintiffs allege that "Defendants used the threat of deportation and liability under promissory notes to prevent Plaintiffs from voluntarily terminating their employment, seeking alternative employment, and/or objecting to their under- or non-payment, even during periods of benched time. Complaint, at 18, 27, 53, 54, 55 and 57.

An H1B employer is not permitted to require an employee to pay a "penalty" for ceasing employment but an employer is permitted under certain circumstances to receive "bona find liquidated damages." See 20 CFR 655.731(c)(10)(i)(B). Specifically that provision provides in pertinent part as follows:

> (A) The employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date. Therefore, the employer shall not make any

> deduction from or reduction in the payment of the required wage to collect such a penalty.
>
> (B) <u>The employer is permitted to receive bona fide liquidated damages from the H-1B nonimmigrant who ceases employment with the employer prior to an agreed date</u>. However, the requirements of paragraph (c)(9)(iii) of this section must be fully satisfied, if such damages are to be received by the employer via deduction from or reduction in the payment of the required wage.
>
> (C) The distinction between liquidated damages (which are permissible) and a penalty (which is prohibited) is to be made on the basis of the applicable State law….

<u>Id</u>. (*emphasis added*). Plaintiffs actually admit as much in their Complaint. "The H-1B employer may not require the H-1B employee to pay a penalty for leaving employment prior to any agreed date. This restriction, however, does not preclude the employer from seeking liquidated damages that reasonably estimate the extent of damage that the employee's breach of contract would cause. <u>See</u> 20 C.F.R. § 655.73 l(c)(10)(i)." Complaint, at 20.

Plaintiffs' characterization that the the sum required to be paid by Plaintiffs' pursuant to the promissory notes at issue is itself a legal conclusion and, therefore, the Court is not required to accept it as true for purposes of this Motion to Dismiss. Once the characterization is removed the only remaining alleged fact is that Plaintiffs were required to pay a certain set sum of money if they did not satisfy they obligations under their employment agreements with Defendants. Whether that sum should be construed as a penalty or a bona fide liquidated damages provision, is a question of law.

Moreover, Plaintiffs have not plead facts sufficient to establish that the sum certain is not an enforceable liquidated damage under Indiana law. Pursuant to Subsection (C) of the regulation above, the distinction between liquidated damages and

a penalty is to be made on the basis of the applicable State law. The law applicable to this suit and these employment agreements and promissory notes is the law of the State of Indiana. Under Indiana law, a stipulated sum may be unenforceable only if it is "grossly disproportionate to the loss which may result from the breach." Gershwin, 685 N.E.2d at 1128. Plaintiffs have plead no facts relevant to whether or not the amount was grossly disproportionate to the loss.

In the end, the parties negotiated contractual sum certain at issue is something which is not on its face a violation of federal immigration law and, is in fact something which may be specifically permitted under those regulations so long as it is not grossly disproportionate to the loss which may result from an employees breach. Accordingly, this sum certain should be permitted to form the basis of any TVPA violation. To do so would be to punish Defendants for doing what they are permitted to do by federal regulation.

The allegations related to the sum certain are simply insufficient to raise a right to relief above the speculative level or enough to state a claim to relief that is plausible on its face.

**3.    Alleged "Other Serious Harms"**

Plaintiffs also allege that Defendants violated the TVPA by threatening "other serious harms." However, Plaintiffs' complaint lacks any specificity regarding these alleged other serious harms. Therefore, they cannot support Plaintiffs' TVPA claims.

**4.    Conclusion**

Defendants are guilty of nothing more than following the statutes and regulations which govern employers who employ H1B workers. If deportation (which is mandated

by federal law) and liquidated damages (which are expressly permitted by federal law) can form the underpinnings of forced labor, then ever employer who employs H1B workers and contracts for liquidated damages would be simultaneously in compliance with federal immigration law and in violation of the TVPA. Such a state cannot possibly have been intended by Congress when it enacted these laws.

**D.    PREVAILING WAGE AND BENCHING CLAIMS**

The Court has already dismissed Plaintiffs' "benching" claims. Although Plaintiffs have not plead a "benching claim" specifically, Plaintiffs' Complaint is replete with allegations related to the now dismissed benching claims. See Complaint, at 17, 18, 28 and 58. It appears Plaintiffs are still trying to bring those claims into this case. Therefore, Defendants respectfully request, for all the reasons set forth in the Court's Entry on Motion to Dismiss [Dkt. 129], that the Court again dismiss any "benching related claims."

**III.    <u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Third Amended Class Action Complaint.

                    Respectfully,

                    <u>*s/ G. John Cento*</u>
                    G. John Cento
                    CENTO LAW, LLC
                    334 North Senate Avenue
                    Indianapolis, Indiana 46204
                    P: (317) 908-0678
                    E: cento@centolaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically on this 17th day of March, 2014. Notice of this filing will be sent to the following by operation of the Court's electronic filing system or U.S. Mail:

Daniel Kotchen
Justin T. Ervin
Kotchen & Low LLP
dkotchen@kotchen.com jervin@kotchen.com

Andrew P. Wirick
Hume Smith Geddes Green & Simmons, LLP
awirick@humesmith.com

Michael F. Brown
Peterson Berk & Cross, S.C.
mbrown@pbclaw.com

<u>*s/ G. John Cento*</u><br>G. John Cento