**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| RITURAJ SINGH PANWAR, and | ) | |
| MICHAEL RICHARD BAUTISTA AGUSTIN, | ) | |
| on behalf of themselves | ) | |
| and all others similarly situated, | ) | Case No.: 1:12-cv-00619-TWP-TAB |
| | ) | |
| | ) | **CLASS ACTION** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ACCESS THERAPIES, INC.,RN STAFF, INC., | ) | |
| d/b/a REHABILITY CARE, RAMON VILLEGAS, | ) | |
| MANUEL GARCIA, and HARVINDER DHANI | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 1

PROPOSED CLASS DEFINITION ................................................................................. 18

ARGUMENT ..................................................................................................................... 20

   I.   PLAINTIFFS SATISFY THE RULE 23(a) AND (b)(3) REQUIREMENTS. ................. 20

      a.   Plaintiffs' Proposed Class Satisfies the Rule 23(a) Numerosity Requirement. ............ 21

      b.   Plaintiffs Satisfy the Rule 23(a) Commonality Requirement. ....................................... 22

      c.   Plaintiffs Satisfy the Rule 23(a) Typicality Requirement. ............................................. 23

      d.   Plaintiffs Satisfy the Rule 23(a) Adequacy Requirement. ............................................. 24

      e.   Plaintiffs Satisfy the Rule 23(b)(3) Predominance and Superiority Requirements. ...... 25

         i.   *Common Questions of Law and Fact Predominate.* ................................................... 25

         ii.   *Plaintiffs Satisfy the Rule 23(b)(3) Superiority Requirement.* ................................... 28

   II.   BIFURCATION IS APPROPRIATE UNDER RULE 23(c). .......................................... 31

   III.   PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL. ............... 33

CONCLUSION .................................................................................................................. 34

Plaintiffs Rituraj Singh Panwar and Michael Richard Bautista Agustin ("Plaintiffs"), by their undersigned attorneys, hereby submit this Memorandum of Law in support of their Motion for Class Certification.  As argued below, this Court should grant Plaintiffs' motion.

## INTRODUCTION

In this forced labor case, two affiliated physical therapist placement companies and their shared executives ensnared hundreds of vulnerable immigrant workers in a scheme to force their continued labor and underpay them in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1581, *et seq*. ("TVPA"), and in violation of Indiana Statutory Wage Law, Ind. Code 22-2-5-2 ("ISWL"), and Indiana common law for breach of contract   The scheme was perpetrated through a common course of conduct, presents numerous common questions of law and fact, and is well suited for class treatment.  Plaintiffs seek class certification on the issues of (1) liability; (2) Class entitlement, method of calculating, and amount of punitive damages; and (3) injunctive relief.  Plaintiffs propose that a trial on behalf of a Class be followed by an individualized proceeding to determine the allocation of punitive damages, compensatory damages, and/or restitution for each Class Member.  Bifurcation of this sort is typical and appropriate.  *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individual assessments").

## FACTUAL BACKGROUND

### Defendants' Scheme

As detailed in Plaintiffs' 3rd Amended Complaint (Dkt. No. 161) and Plaintiffs' Motion for Partial Summary Judgment (filed concurrently herewith), Defendants Access Therapies, Inc.

1

and RN Staff, Inc. (d/b/a Rehability Care) (the "Corporate Defendants"),[1] and Defendants Ramon Villegas, Manuel Garcia, and Harvinder Dhani (the "Individual Defendants") (collectively, the "Defendants"), operate a nation-wide physical therapist placement service. *See, e.g.*, 3rd Am. Compl. ¶¶ 6-10.

Since at least May 2006, Defendants have operated an unlawful scheme designed to procure forced labor from a vulnerable immigrant workforce. Defendants' scheme is relatively straightforward. Defendants recruit and hire immigrants. *See, e.g.*, Panwar Decl. ¶¶ 2-3 (Ex. 1); Agustin Decl. ¶¶ 2-4 (Ex. 2). Defendants sponsor these individuals for H-1B visas, and, in some cases, for lawful permanent resident status (*i.e.* green cards). *See, e.g.*, Panwar Decl. ¶¶ 2-3; Agustin Decl. ¶¶ 2-4; 3d Abad Decl. ¶ 4 (Ex. 3). Defendants also require these individuals to sign contracts subject to promissory note and "liquidated damages" provisions,[2] which impose a penalty (*e.g.*, $15,000 or $20,000) if the individual fails to complete the entire term of his or her contract. *See, e.g.*, Panwar Agreement at 4 (Ex. 4); Panwar Promissory Note (Ex. 5); Agustin Agreement at 4 (Ex. 6); Agustin Promissory Note (Ex. 7). Defendants do not pro-rate these provisions depending on the percentage of a contract an employee completes, and the size of the penalties bear no relation to the actual harm to Defendants from a breach, in violation of federal immigration regulations. *See, e.g.*, Agustin Decl. ¶ 15; 20 CFR 655.731(c)(10)(i)(C). According to their contracts, employees are subject to the promissory note and liquidated damages provisions at the time Defendants file the employees' I-129 petitions with United States

---

[1] The Corporate Defendants share the same owners, management, and office space. Dhani Dep. Tr. 8:22-10:18; 12:16-13:6 (Ex. 37).

[2] For simplicity sake, Plaintiffs refer to Defendants' provisions as "liquidated damages" provisions, even though they act as penalty provisions. *See Dean v. Kruse Foundation, Inc. v. Gates*, 973 N.E. 2d 583, 591 (Ind. Ct. App. 2012) ("The distinction between [an unenforceable] penalty provision and one for [enforceable] liquidated damages is that a penalty is imposed to secure performance of the contract and liquidated damages are to be paid in lieu of performance.").

Citizenship and Immigration Services ("USCIS").[3]  *See, e.g.*, Panwar Agreement at 4; Agustin Agreement at 4.  In other words, employees are subject to the penalty before they have even begun work, or even arrived in the United States.  Employees are effectively ensnared in Defendants' forced labor scheme at this point.

When employees begin work for Defendants, they often face a harsh reality:  Defendants refuse to pay employees when they have no client work to assign them, and, even when paid work is assigned, Defendants fail to pay employees their contracted rate of pay.  *See generally* Panwar Decl.; Agustin Decl.  If employees complain about this underpayment or seek to quit, Defendants threaten the employees with promissory note penalties, visa loss, revocation of lawful permanent resident application sponsorship, and deportation.  *See, e.g.*, Panwar Decl. ¶ 11; Agustin Decl. ¶¶ 14-15; Libertino Decl. ¶ 10 (it will "cost you high to leave us") (Dkt. No. 167-2).  Defendants follow through with their threats.  For example, during the class period alone, Defendants have filed at least 94 lawsuits in Marion County court, the overwhelming majority of which are against individuals.  Marion County Docket Report (Dkt. No. 132-2); Marion County Docket Report (Dkt. No. 98-16).  For Defendants, the filing of "lawsuits against former employees for breach of contract" are "matters [of] routine."  Dhani Decl. ¶ 9 (Dkt. No. 137-1).

Defendants control their employees' work assignments and number of hours worked.  *See, e.g.*, Panwar Agreement at 3 ("Employer will make work assignments … Employee agrees to work at least 40 hours per week … as Employer shall designate"); Agustin Agreement at 2 (same).  However, when an employee has completed the term of his or her contract, Defendants

---

[3] USCIS states that this form is "[f]or petitioners filing on behalf of an alien to come to the United States temporarily to perform services or labor, or to receive training, as an H-1B ... nonimmigrant worker" USCIS Website, http://www.uscis.gov/i-129.

regularly require employees to work additional hours through the threat of contractual and promissory note penalties.  *See, e.g.*, Licupa Decl. ¶ 10 (after completing 2 year contract, Defendants required Ms. Licupa "to complete around 400-600 … additional hours of work before I could be released from [her] contract") (Dkt. No. 167-1); Libertino Decl. ¶¶ 9-10 (after completing 3 year contract, Defendants informed Ms. Libertino that "[she] would have to continue working until I completed 1200 additional hours of work").  Moreover, Defendants' propensity for retaliation against employees is well known among its employees.[4]  Through this scheme and pattern of conduct, Defendants force the labor of their immigrant workforce.

Defendants' scheme has affected many employees.  For example, between 2006 and 2013, Defendants filed 1,576 Labor Condition Applications ("LCAs") with the federal government to secure H-1B visas for immigrants.[5]  Moreover, Defendants have identified as putative class members 174 employees with H-1B visas, a number that understates the actual number of H-1B employees considering that Defendants selectively identified H-1B employees and have refused to identify all such employees.[6]  *See* List of Class Members Identified by

---

[4] Anonymous E-mail to M. von Klemperer (Feb. 16, 2014) ("I am afraid if I will take any action against them they may revoke my H1B and my green card petition") (Dkt. No. 167-5); Anonymous E-mail to M. von Klemperer (Feb. 19, 2014) ("I WOULD LIKE TO TALK TO YOU ABOUT SAME REGARDS, BUT I CAN NOT AT THIS TIME AS I HAVE FEW MORE MONTHS TO WORK WITH THEM BECAUSE THEY CAN WITHDRAW MY GREEN CARD PETITION AS WELL AS CUT MY H1B prior to that.") (Dkt. No. 167-6).

[5] Decl. of V. Vandaveer ¶ 1 (Ex. 8).

[6] On October 12, 2012, Plaintiffs issued each Corporate Defendant an interrogatory asking that the Defendants identify all H-1B employees.  *See* Pls.' First Interrogatory (Ex. 9).  (These are the only interrogatories Plaintiffs have issued to date.)  Defendants never responded to these interrogatories, even though Plaintiffs re-sent the interrogatories to Defendants on October 14, 2013.  E-mail from D. Kotchen to J. Cento (Oct. 14, 2013) (Ex. 10).  Plaintiffs learned that Defendants selectively identified H-1B employees when certain H-1B employees contacted Plaintiffs who were not identified by Defendants.  *See, e.g.*, Pls.' Mot. for FRCP 37 Sanctions at 9-10 (discussing Defendants' failure to identify class members) (Dkt. No. 98); Mendoza Decl. ¶ 1  ("I currently work for Access Therapies, Inc. as an H-1B visa worker") (Dkt. 112-1); Defs.'

4

Defendants (Ex. 11).   Moreover, Defendants' scheme has proven profitable.   For example, Defendant Access Therapies earned $3,209,377 on revenue of $15,028,582 in 2009, $2,968,898 on revenue of $17,367,609 in 2010, and $3,129,849.65 on revenue of $17,269,807.34 in 2011. Ex. Defs.' Financial Records 2009-2011 (Ex. 12).[7]

***Plaintiff Rituraj Panwar***

Mr. Panwar is a citizen of India.   In June 2010, Mr. Panwar accepted an offer to work for RN Staff.   Mr. Panwar signed an RN Staff employment contract and promissory note.   Panwar Decl. ¶¶ 1-2

The RN Staff contract term was "TWO YEARS (4160 hours of work)."   Panwar Agreement at 1.   Under the contract, Mr. Panwar would be paid "$800-$1,000 net pay per week."   *Id.* at 3.   In addition, Mr. Panwar was obligated "to work as soon as [he] got *[sic]* the working permit &/or working visa or as long as [he] can legally work for the employer whichever comes first."   *Id.* at 6.

The RN Staff contract contained the following provision:

> If the Employee leaves his/her employment before the completion of the two years initial term of employment, Employee shall pay all liquidation cost incurred by the Company, $20,000 plus all costs associated with collection, or litigation, plus interest, court cost and Attorney's fees, whether or not a lawsuit is commenced as part of the collection process.   The term should be effective upon actual filing of the I-129 petition.

*Id.* at 4.

Similarly, the RN Staff Promissory Note contained the following provision:

---

Supp. Sanctions Reply at 8-9 (stating that failure to identify Mr. Mendoza was "an inadvertent oversight") (Dkt. No. 119).

[7] Plaintiffs received Access Therapies' tax returns from a third party.   Defendants have committed to producing to Plaintiffs all their financial documents if a class is certified in this case.

> **PROMISE TO PAY:   Rituraj Singh Panwar** ("Employee")
> promise *[sic]* to pay to **Rehability Care** of Indiana ("Employer"),
> or order, in lawful money of the United States of America, the
> principal amount of **Twenty Thousand/100 Dollars ($20,000)**
> together with interest at the rate of **10.00%** per annum on the
> unpaid principal balance until paid in full, if the Employee failed to
> finish the contract that he signed with Rehability Care 2 years
> (4160 hours).

Panwar Promissory Note at 1.

On or around June 10, 2010, to secure an H-1B visa for Mr. Panwar, RN Staff filed an

LCA with the Department of Labor and the U.S. Citizenship and Immigration Services.  Panwar

LCA (Ex. 35). In the LCA, RN Staff attested under penalty of perjury (a) it had a paid

"REHABILITATION COORDINATOR" position available for Mr. Panwar for a three-year

period in Bellmore, NY, and (b) that it would pay Mr. Panwar  for "non-productive time."

Panwar LCA at  2, 4.

RN Staff filed Mr. Panwar's I-129 petition on July 8, 2010.  Panwar I-797A at 1

(indicating receipt date of July 8, 2010) (Ex. 13).  Thus, as of July 8, 2010, Mr. Panwar was

obligated to pay RN Staff a minimum of $20,000 if he did not complete his two year, 4,160 hour

term with the company.  Panwar Agreement at 6.

Mr. Panwar's I-129 petition was approved and he received an I-797 with an April 5, 2011

validity date. Panwar I-797A at 1.  He could thus begin working for RN Staff on April 5, 2011,

and was available to do so.  Panwar Decl. ¶ 3; 8 CFR 214.2(h)(13)(i)(A).  However, contrary to

its representation to the federal government in its LCA, RN Staff did not have a "Rehabilitation

Coordinator" position available for Mr. Panwar.  Panwar Decl. ¶ 3; Panwar LCA at  2, 4.

On April 8, 2011, Mr. Villegas informed Mr. Panwar that his H-1B visa was approved.

E-mail from R. Villegas to R. Panwar (Apr. 8, 2011) (Dkt. No. 1-2 at 1-4).  As of this date, Mr.

Panwar was eligible for a one-year temporary physical therapist license, but Mr. Villegas

encouraged Mr. Panwar not to apply for a temporary license, but instead to study for and take the National Physical Therapy Exam ("NTPE"):

> Since the NPTE is just around the corner, perhaps it would be best that you concentrate on your studies to ensure that you will pass the exam. If you pass, we need not go through the tedious process of applying for a temporary license in the first place.

*Id.*

Mr. Panwar thus focused on studying for the NPTE. Panwar Decl. ¶ 4. Defendants did not provide paid work. Panwar Decl. ¶¶ 4, 7. Mr. Panwar thus sought "financial assistance," but was told that financial assistance was not available until he passed the NPTE.[8]

Mr. Panwar's financial situation was dire. Panwar Decl. ¶ 6. By August, he was asked to leave a friend's house where he was staying for free and moved in with his cousin. *Id.* In August, Mr. Panwar took and passed the National Physical Therapy Assistance Exam, thus receiving a Physical Therapy Assistant ("PTA") license. *Id.*; Email from R. Panwar to R. Villegas at 3 (Aug. 15, 2011) ("And I m [sic] glad to inform you that I have cleared the physical therapy assistant license exam.") (Ex. 15).

Upon Mr. Villegas being notified that Mr. Panwar passed the exam, on August 15, 2011, Mr. Villegas inquired of Mr. Garcia and other employees of Defendants whether it "would [] be possible to place him as a PTA in NY while he still tries to take the NPTE" and whether Defendants' "marketing team" could "prioritize him for placement." Email from R. Villegas to M. Garcia at 1 (Aug. 15, 2011) (Ex. 16); Dhani Dep. Tr. at 25:12-24, Dep. Ex. 4. Later that day, Mr. Villegas informed Mr. Panwar that he should still focus on passing the "PT licensure exam"

---

[8] Email from R. Panwar to R. Villegas at 1 (May 26, 2011) ( "financial assistance" and Mr. Villegas email to Mr. Garcia at his accessinternational08@gmail.com address questioning "We tell [Mr Panwar] that we cannot provide financial assistance till we get the results of the NPTE?") (Ex. 14); Dhani Dep. Tr. at 25:12-24, Dep. Ex. 4 (confirming accessinternational08@gmail.com email address belongs to Mr. Garcia).

since Mr. Panwar was more valuable as a licensed physical therapist as opposed to a physical therapy assistant:

> Congratulations on passing the PTA licensure exam! Will coordinate Marketing on possible placements for you but we still want you to pursue the PT licensure exam since we know that you can earn more if you have a PT license compared to a PTA license. Don't you think it would be wiser to wait and prepare for the September 7 NPTE (3 weeks away) rather than start on new work?

Email from R. Villegas to R. Panwar at 2 (Aug. 15, 2011) (Ex. 15).

Mr. Panwar responded that he would "highly appreciate[]" if Defendants could find a "PTA job" while he continued to study for the NPTE. *Id.* at 2-3. But Mr. Villegas re-confirmed that "the exam is always the priority" and that Mr. Panwar should not "try[] to accomplish . . . adjustment to a new job[.]" *Id.* at 1.

Defendants did not place Mr. Panwar in a paid position until December 5, 2011, at which point he started being paid weekly. Panwar Decl. ¶ 7. But Defendants routinely paid Mr. Panwar less than the $800 to $1,000 net pay per week to which he agreed in the contract. *Id.*; Panwar Payroll Report 2011 (Ex. 17); Panwar Payroll Report 2012 (Ex. 18).

Between April 5, 2011 and December 4, 2011 – an eight-month period – Defendants did not pay any wages to Mr. Panwar. Panwar Decl. ¶ 7. During these eight months, Mr. Panwar performed extensive duties for Defendants, such as participating in web-based, studying for exams, communicating frequently with Defendants, completing formwork, searching for paid client projects, working on resumes and client applications, attending client interviews, and other activities. *Id.* ¶ 8.

The stress of the eight-month period of no pay took its toll. During this period, Mr. Panwar had daily anxiety and stress, daily headaches, bouts of crying, five to fifteen pounds of weight loss, and considerable hair loss. Panwar Dep. Tr. at 189:6-23, 194:7-201:11 (Ex. 19). In

8

addition, Mr. Panwar moved between friends' (and a cousin's) homes because he could not afford rent, was forced to borrow money from his cousin, and to charge significant amounts to his credit cards. *Id.* at 19:6-29:10, 31:14-33:4; 34:20-37:3.

For two reasons, Mr. Panwar was forced to remain employed by Defendants. Panwar Decl. ¶ 10. First, if he quit, he would owe RN Staff a minimum of $20,000. *Id.*; Panwar Agreement at 4; Panwar Promissory Note at 1. Mr. Panwar is an immigrant who agreed to work for net pay of $800 to $1,000 per week. Panwar Decl. ¶ 10. He could not afford to pay RN Staff $20,000 if he quit. *Id.* Thus, the liquidated damages clause and promissory note forced Mr. Panwar to remain with Defendants, even though he was not paid for an eight-month period and then underpaid thereafter *Id.*

Second, if he quit, Mr. Panwar risked deportation. Mr. Panwar's H-1B visa allowed him only to work for RN Staff. INA § 237(a)(1)(C)(i). Thus, if he quit – or otherwise lost his job – Mr. Panwar risked being deported to India. Panwar Decl. ¶ 10.

***Plaintiff Michael Agustin***

In 2009, Mr. Agustin was living in the Philippines and applied for a position with Access Therapies. Agustin Decl. ¶ 2. Access Therapies offered him a job, and he accepted. *Id.* In April 2009 Access Therapies sent Mr. Agustin a contract and promissory note that Access Therapies had prepared, and to which Mr. Agustin agreed. *Id.*

The Access Therapies contract term was "THREE YEARS (6240 hours of work) after [Mr. Agustin] receives his/ her visa and arrives in the U.S.A." Agustin Agreement at 1. Under the contract, Mr. Agustin would be paid "$27 - $35 per hour." *Id.* at 3.

The Access Therapies contract contained the following provision:

> If the Employee leaves his/her employment before the completion
> of the three years initial term of employment, Employee shall pay

all cost incurred by the Company, $15,000 plus all costs associated with collection, or litigation, plus interest, court cost and Attorney's fees, whether or not a lawsuit is commenced as part of the collection process.  The term should be effective upon actual filing of the I-129 petition.

*Id.* at 4.

Similarly, the Access Therapies promissory note contained the following provision:

**PROMISE TO PAY: Michael Richard B. Agustin** ("Employee") promise to pay to Access Therapies, INC. of Indiana ('Employer"), or order, in lawful money of the United States of America, the principal amount of **Fifteen Thousand/100 Dollars** [sic] **($15,000.00)** together with interest at the rate of **10.00%** per annum on the unpaid principal balance until paid in full, if the Employee failed to finish the contract that he signed with Access.

Agustin Promissory Note at 1.

To secure an H-1B visa for Mr. Agustin, Access Therapies filed an LCA with the Department of Labor and the U.S. Citizenship and Immigration Services.  LCA Documentation Agustin at 7 (Ex. 20). In the LCA, RN Staff attested under penalty of perjury (a) it had a paid "PHYSICAL THERAPIST" position available for Mr. Agustin for a three-year period in St. Petersburg, FL, and (b) that it would pay Mr. Agustin for "non-productive time." *Id.*[9]

Access Therapies filed Mr. Agustin's I-129 petition on May 4, 2009.  Agustin I-797B at 1 (Ex. 21) (indicating receipt date of May 4, 2009).  Thus, as of May 4, 2009, Mr. Agustin was obligated to pay Access Therapies a minimum of $15,000 if he did not complete his three-year, 6,240 hour term with the company.   Agustin Agreement at 4 (Article VI "Recovery of Expenses", providing "term should be effective upon actual filing of the I-129 petition").  On

---

[9] Exhibit 20 includes Access Therapies' LCA documents for Mr. Agustin, as they were produced to Plaintiffs by Defendants.  The last page of Exhibit 20 reflects the Physical Therapist position Access Therapies represented to the government was available upon Mr. Agustin's start of employment.  Further, as reflected on pages 2-6 of Exhibit 20, LCA formwork requires that a sponsoring employer attest that it will pay the employee for "non-productive time."

August 10, 2009, Eve Graue, a Recruiter for Access Therapies, informed Mr. Agustin that his H-1B visa was approved. Agustin Decl. ¶ 3; Email from E. Graue to M. Agustin at 1 (Aug. 10, 2009) (Ex.22).

Mr. Agustin's I-129 petition was approved and he received an I-797 with an October 1, 2009 validity date.  Agustin I-797B at 1.  He could thus begin working for Access Therapies on October 1, 2009, and was available to do so.  Agustin Decl. ¶ 4; 8 CFR 214.2(h)(13)(i)(A).  Mr. Agustin thus relocated from the Philippines to the United States, arriving on September 28, 2009. Agustin Decl. ¶ 4.  Contrary to its representation to the federal government in its LCA, Access Therapies did not have a "Physical Therapist" position available for Mr. Agustin.  *Id.* ¶ 5.  Mr. Agustin was not aware of this fact until after his employment began.  *Id.*

Upon starting at Access Therapies on October 1, 2009, Mr. Agustin was not paid because Access Therapies did not have a paying client to which to assign him.  *Id.* ¶ 6.

By October 26, 2009, Mr. Agustin's financial situation was dire and he emphasized to Access Therapies his need to start an assignment.  *Id.* ¶ 8; Email from M. Agustin to E. Garcia at 2 (Oct. 26-27, 2009) ("I arrived in Indiana last September 28, 2009 so hopefully you will be able to assign me as soon as you can.  I'm already running out of funds and I'm very much ready to start working."); E-mail from M. Agustin to Eve ("Mam, please help me to request for mam Eugene to deploy me as soon as she can. I'm running out of funds. I'll wait for your email. Thank you.") (Ex. 23).

On October 27, 2009, Access Therapies responded to Mr. Agustin that it was "working hard" to try to find him a paid assignment and asked he "be patient:"

> I have several clients in FL looking for PT's however every time I submitted your resume I was turn down they are looking for more experience PT or with U.S. experience.  Please be patient I am working hard to get you place.  Thanks.

11

*Id.* at 1-2.

On November 4, 2009, Mr. Agustin was assigned to work for a paying third-party client and finally began receiving weekly paychecks from Access Therapies. Agustin Decl. ¶ 9. During the October 1 to November 3, 2009 period in which he was not paid by Access Therapies, Mr. Agustin performed extensive duties for Defendants, such as participating in three full days of orientation activities at Access Therapies' facility, CPR training, studying for exams, communicating frequently with Defendants, completing formwork, searching for paid client projects, working on resumes and client applications, attending client interviews, and other activities. *Id.* ¶ 7. During this time, he performed up to 30 hours of work per week of these activities. *Id.*

Mr. Agustin's paid assignment ended on November 9, 2012. *Id.* ¶ 9. He then endured a second extended period in which he received no pay from Access Therapies. *Id.* ¶ 10.

By November 26, 2012, Mr. Agustin had gone two weeks without pay and could not continue to support his family. E-mails between M. Agustin and Defendants at 2-3 (Nov. 26-27, 2012) (Ex. 24). By this point, he was living off of funds that he had borrowed from his mother-in-law. Agustin Decl. ¶ 11. Access Therapies had a short-term position 378 miles away in Crestview, FL, but the cost of short term housing in Crestview was too expensive considering Mr. Agustin's hourly wage. *Id.* ¶ 11; E-mails between M. Agustin and Defendants at 2-3 (Nov. 26-27, 2012). Thus, considering that he had only nine weeks left on his contract, Mr. Agustin asked to be "released" from his contract – "without paying the penalties" – so that he could "move on to another employer:"

> [I]t's been 2 weeks now that I have no pay/salary and you know I have expenses/bills to pay. It is really hard because I'm the only one working and I have to support my wife and my family in the

12

> Philippines who depend on me.  In view of this, I hope you
> understand, that I would like to request for Access, to formally
> release me from the contract (without paying the penalties), so that
> I can move on to another employer[.]

*Id.*

Manny Garcia from Access Therapies declined Mr. Agustin's request and informed Mr. Agustin that he could either "work with [Access Therapies] on [his] next assignment or [he could] settle [his] account with [Access Therapies] to release." *Id.* at 2.  Mr. Agustin then inquired how to prorate the $15,000 penalty if he left Access Therapies considering that he only had "9 weeks or 356 hours left" in his contract.  *Id.* at 1.  Mr. Garcia informed Mr. Agustin that the $15,000 penalty was not "set up" to be prorated, such that he would owe the entire amount if he left. *Id.*  ("I don't think our contract was set up for prorated penalty.  Whatever the penalty in the *con*tract is what it is.").

A $15,000 "penalty" was "too expensive" so that Mr. Agustin was forced to remain employed by Access Therapies, informed the company that he would take any assignment, and asked for "bench pay or salary" during the period in which he was not assigned paid project work:

> I checked the contract and the total amount of penalty is $15,000 if
> I breach the contract and that is too expensive so I will not be able
> to settle my account.  I emailed Ma'am Eugene today and told her
> I'm willing to be assigned anywhere here in FL that there is an
> opening.  I have been helping her to look for an assignment/work
> and will continue to help her.  But as of now that I have no
> assignment, is it possible that you can give me a bench pay or
> salary?  I have bills to pay and expenses to cover and I've been out
> of work since November 9th.

*Id.*

Except for two days in early January (January 8 and 10), Mr. Agustin was not assigned to another paid project – and was not paid – until January 21, 2013.  Agustin Decl. ¶ 13. This

13

project ended on March 22, 2013.  *Id.* Mr. Agustin then left Access Therapies.  *Id.*  His contract term had recently ended as of the point he left.  *Id.*

For two reasons, Mr. Agustin was forced to remain employed by Defendants even when he experienced periods of no pay.  Agustin Decl. ¶ 14.  First, if he quit, he would owe Access Therapies a minimum of $15,000.  *Id.*  Mr. Agustin was "scared" by the prospect of paying the "huge" $15,000 penalty from the time he first saw it, and told an Access Therapies representative it was "expensive" and "if something happens, I won't be able to do [pay] it."  Agustin Dep. at 21:13-15, 61:4-62:14 (Ex. 25).

Second, if he quit, Mr. Agustin risked deportation back to the Philippines. Agustin Decl. ¶ 16.  Mr. Agustin's H-1B visa allowed him only to work for Access Therapies.  INA § 237(a)(1)(C)(i).  Thus, if he quit – or otherwise lost his job – Mr. Agustin risked deportation.

### *Other Class Members Faced Substantially Similar Treatment*

Class Members faced substantially similar treatment.  For example, Melissa Licupa signed a contract with Access Therapies on July 12, 2005 to work for two years as a physical therapist on an H-1B visa.  Licupa Decl. ¶¶ 2-3.  Ms. Licupa's contract contained a liquidated damages provision and she was required to sign a promissory note.  *Id.* ¶ 2.  Ms. Licupa was in the United States on October 1, 2008, her I-797 validity date, and was prepared to begin working for Defendants.  Licupa Decl. ¶ 3.  She informed Defendants that she was available for work and repeatedly inquired about work assignments and pay.  *Id.* ¶¶ 4-5.  However, Defendants failed to assign her client work until late January 2009, and did not pay her until mid-February 2009.  *Id.* ¶ 6.  Between October 1, 2008 and late January 2009, Ms. Licupa performed work for Defendants, such as participating in orientation, but received no pay.  *Id.*  Over the course of her employment, Ms. Licupa was repeatedly subject to these periods of benching without pay.  *Id.* ¶

14

8. This lack of pay caused her considerable hardship. *Id.* ¶ 7. After Ms. Licupa ended her 2-year employment agreement with Defendants, Defendants refused to release her, instead demanding that she work an additional 400-600 hours to avoid a promissory note penalty. *Id.* ¶ 10.

Similarly, Arlin Libertino signed a three-year contract with RN Staff on October 4, 2010 to work as a physical therapist on an H-1B visa. Libertino Decl. ¶ 2. She was subject to contractual and promissory note penalties of over $26,300. *Id.*; Libertino (nee Covero) Contract at 4 (Ex. 26). Her contract stated that she would be paid a weekly salary of $1,200 net. *Id.* at 3. However, RN Staff regularly paid her less than $1,200 a week net. Libertino Decl. ¶ 3. In August 2013, Ms. Libertino informed RN Staff that she would be ending her employment in October 2013, three years after starting her three-year contract. *Id.* ¶ 9. Defendants informed Ms. Libertino that she could not leave in October 2013 because her contract would not be complete. *Id.* ¶ 10. Defendant Manuel Garcia, an RN Staff executive, contacted Ms. Libertino, and angrily told her that it would "cost you high to leave us." *Id.* Ms. Libertino believed he was referring to the penalty RN Staff would impose under her contract and promissory note if she left before completing her term of employment. *Id.* After hearing this, Ms. Libertino was afraid to leave her employment with Defendants, and, as of February 26, 2014, she remained employed with Defendants. *Id.*

As a final example, Dante Abad signed a contract with Access Therapies on February 23, 2009 to work as a physical therapist at a rate of $30 per hour on an H-1B visa. Abad Decl. ¶ 2. He later signed a contract with RN Staff specifying a weekly salary of $1,100 net. *Id.* Each contract contained a liquidated damages provision, and was subject to a promissory note penalty of $15,000. *Id.* Mr. Abad arrived in the United States and was prepared to work on January 13,

15

2010.  *Id.* ¶ 3.   However, Access Therapies failed to assign him work until late February 2010.

*Id.*   Over the course of his employment, Access Therapies regularly paid him less than his

contracted wage.  *Id.* ¶ 4.  Mr. Abad has also faced periods of benching without pay.  *Id.* ¶ 9.  In

October 2013, Mr. Abad contacted RN Staff to inquire about ending his employment in order to

pursue employment with another company.  *Id.* ¶ 8.  Mr. Garcia responded to Mr. Abad's inquiry

and told him that to leave, he would need to pay his full $15,000 promissory note penalty.  *Id.*

Mr. Abad requested that Defendants pro-rate the penalty, given Mr. Abad's four years of service

to the company.  *Id.*  Mr. Garcia refused.  *Id.*  Because he was unable to afford this penalty, Mr.

Abad continued working for Defendants.  *Id.*

### *Defendants' Recent Misconduct – A Continuation of Defendants' Scheme*

Defendants' misconduct over the course of this litigation was done in furtherance of their

forced labor scheme.   On February 14, 2013, the parties participated in a Court-ordered

settlement conference.  Following this conference, Defendants asked for Plaintiffs' preliminary

damages calculations for putative Class Members.  Plaintiffs sent Defendants these calculations

in good faith on March 1, 2013. E-mail from M. Brown to J. Cento (March 1, 2013) (Ex. 34).  In

March 2013, Defendants launched their "Signature Campaign."  Having received Plaintiffs' list

of Class Member damages, Defendants systematically contacted currently-employed Class

Members to pressure them into signing away their rights using crude "releases" and discourage

them from participating in this litigation.   Employees were given no choice but to sign these

"releases" and were provided no consideration beyond the employees' continued "good tenure

with the company."   E-mail from T. Mabesa to A. Covero (Mar. 20, 2013) ("As per our

conversation earlier, I am seeking your support thru this signature campaign.   Please find

attached letter for your signature.  Please sign and fax back to my attention") (Ex. 27); Mendoza

Decl. Ex. G (Dkt. No. 112-1).  If an employee expressed concern over signing the "release," *see* E-mail from A. Covero to T. Mabesa (Mar. 20, 2013) ("I just read the content of the letter.  I cannot signed this for now until I get my paycheck questions answer") (Ex. 27), Defendants exerted additional pressure until the employee consented, E-mail from T. Mabesa to A. Covero (Mar. 26, 2013) ("I just want to follow up the letter.  Please let me know when will you fax it.") (Ex. 28).  Defendants did not disclose to Plaintiffs (or the Court) the existence of the Signature Campaign (even though e-mails and the "releases" were responsive to discovery requests).  *See* Pls.' Supp. Sanctions Brief at 2 (Dkt. 114).  Rather, Plaintiffs learned about the existence of the Signature Campaign from third-parties.  *See* Mendoza Decl. ¶ 5, Ex. G.

The following month, in April 2013, Defendants launched a coordinated effort to tamper with witnesses and undermine the effectiveness of Court-ordered discovery collection.  *See* Pls.' Mot. For Witness Tampering and Discovery Misconduct Sanctions (Dkt. Nos. 166-67, 177).  Specifically, Defendants' executives directed at least five staff members to call Class Members and discourage them from producing documents in response to a Court-ordered e-mail request.  Pls.' Witness Tampering Reply at 3.  In this way, Defendants were successfully able to prevent Plaintiffs from obtaining crucial discovery from putative Class Members and discourage their participation in this case.  *Id.* at 4.  Defendants never informed Plaintiffs of these efforts until Plaintiffs learned of them from third-parties.  *See, e.g.*, Abad Decl. ¶ 7; Libertino Decl. ¶ 8.

Finally, Defendants have engaged in a number of other efforts to intimidate witnesses and Class Members and discourage their participation in this case.  For example, Erickson Mendoza provided a declaration that Plaintiffs submitted in support of their Motion for FRCP 37 Sanctions.  (Dkt. No. 112-1).  Eleven days later, Defendants sued Mr. Mendoza.  *Access Therapies v. Mendoza* Compl. (Dkt. No. 120-2).  Furthermore, Defendants have engaged in

17

additional witness tampering.  After Dante Abad provided a declaration that Plaintiffs submitted in support of their Motion for Witness Tampering and Discovery Misconduct Sanctions, Defendant Ramon Villegas called Mr. Abad in an effort to intimidate him into reversing his signed statement and discourage his further participation in the case.  *See* Pls.' Witness Tampering Reply at 4-6.  Mr. Villegas secretly (and illegally) recorded this conversation.  *Id.*

## PROPOSED CLASS DEFINITION

Plaintiffs seek certification of a Class to pursue claims against the Defendants.  The Class is defined as:

> Current and former H-1B, lawful permanent resident, and lawful permanent resident applicant employees, who worked for Defendants under potential promissory note penalty, contractual penalty, and/or potential loss of their immigration status, and/or suffered financial loss relating to Defendants' failures to pay required wages and/or visa fees from six years prior to the date of the filing of the Complaint (Dkt. No. 1) through the present, and continuing until the Defendants' unlawful conduct ceases (the "Class Period").[10]

Plaintiffs have slightly altered the class definition from that proposed in the Third Amended Complaint to ensure that it includes all victims of Defendants' unlawful scheme.  First, Plaintiffs have added a reference to the contractual liquidated damages penalty which operated in concert with Defendants' promissory notes.  Second, Plaintiffs have altered the class definition to encompass all of Defendants' non-executive employees, including those working under H-1B visas, lawful permanent residents (*i.e.*, green card holders), and lawful permanent resident applicants.  This change reflects that Defendants' unlawful forced labor and underpayment scheme was not limited only to those individuals working under H-1B visas, but was also directed at lawful permanent resident applicants, and lawful permanent residents.  This alteration

---

[10] Excluded from this class are the individual Defendants and their relatives, as well as the officers, parents, subsidiaries, affiliates, of the corporate Defendants.  Also excluded from this class are the Court and its officers, employees, and their relatives.

"does not change the essential scope of the class as stated in the amended complaint," because the Class still includes the same individuals. *Carter v. Ind. State Fair Comm.*, No. 1:11-cv-00852, 2012 WL 4481348, *4 (S.D. Ind. Sept. 28, 2012); *see In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) (citing *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) ("district court[s have] the authority to modify a class definition at different stages in litigation" and do so "regularly"). A large number of Class Members began working for Defendants under H-1B visas. Vandaveer Decl. ¶ 1 (indicating that Defendants have filled 1,576 LCAs between 2006-2013). However, some employees obtained lawful permanent resident status over the course of their employment. *See* Mabesa Depo. Tr. Tr. 17:18-18:22 ("Q: What has been the reason for the decline in the number of H1B employees [between 2009 and 2014]?" A: They got their green cards.") (Ex. 36).

For example, Mr. Abad began working for Defendants under an H-1B visa on January 13, 2010. Abad. Decl. ¶ 3. While still employed by Defendants, he applied for permanent resident status on and was approved on May 6, 2013. 3d Abad Decl. ¶ 4. Defendants required Mr. Abad to sign an additional 18-month employment contract and $15,000 promissory note before they would sponsor his lawful permanent resident application. *Id.* ¶ 4. E-mail from Michelle [Marcos] to D. Abad (June 14, 2012) (Please see attached copy of our contract with the checklist of documents need for the eb2 petition") (Ex. 29); E-mail from Tess Delacruz to D. Abad (July 31, 2012) ("Please mail the signed original contract and promissory notes. This contract is for your EB2 petition") (Ex. 30). When Mr. Abad sought to terminate his employment in favor of another employer in October 2013 Defendants refused to release him or even pro-rate his $15,000 promissory note. Abad Decl. ¶ 8.

Thus, lawful permanent residents are subject to the exact same promissory note and liquidated damages provisions as H-1B employees.  And as with H-1B workers, lawful permanent resident applicants are subject to Defendants' scheme and pattern of immigration-related threats and retaliation.[11]  Accordingly, the change in Class definition simply ensures that Defendants' liability to these individuals is not arbitrarily circumscribed at the point they obtain lawful permanent resident status.  The Class remains easily ascertainable and well-defined, and includes the same individuals.

## ARGUMENT

Plaintiffs seek class certification on the issues of (1) liability; (2) Class entitlement, method of calculating, and amount of punitive damages; and (3) injunctive relief.  As discussed in Section II, below, Plaintiffs propose that a trial on behalf of a Class be followed by an individualized proceeding to determine the allocation of punitive damages, compensatory damages, and/or restitution for each Class Member.

## I.    PLAINTIFFS SATISFY THE RULE 23(a) AND (b)(3) REQUIREMENTS.

"The determination of whether to certify a putative class is within the broad discretion of the district court."  *Cox v. Sherman Capital LLC*, 295 F.R.D. 207, 211 (S.D. Ind. 2013) (citation omitted).  For a class to be certified, Plaintiffs must satisfy the requirements of Rule 23(a) and at least one of the three requirements of Rule 23(b).  Fed. R. Civ. P. 23(a)-(b).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  Rather,

---

[11] *See, e.g.*, Anonymous E-mail to M. von Klemperer (Feb. 16, 2014) ("I am afraid if I will take any action against them they may revoke my H1B and my green card petition"); Anonymous E-mail to M. von Klemperer (Feb. 19, 2014) ("I WOULD LIKE TO TALK TO YOU ABOUT SAME REGARDS, BUT I CAN NOT AT THIS TIME AS I HAVE FEW MORE MONTHS TO WORK WITH THEM BECAUSE THEY CAN WITHDRAW MY GREEN CARD PETITION AS WELL AS CUT MY H1B prior to that.").

"[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.  Plaintiffs satisfy the requirements for class certification.

### a.   Plaintiffs' Proposed Class Satisfies the Rule 23(a) Numerosity Requirement.

Plaintiffs satisfy the Rule 23(a)(1) numerosity requirement.   A plaintiff satisfies this requirement where he demonstrates the putative class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).   Joinder need not be impossible, "but instead must be shown to be inconvenient and difficult."  *Olson v. Brown*, 284 F.R.D. 398, 407 (N.D. Ind. 2012) (citation omitted).   In determining whether joinder is impracticable, "courts often consider many factors, including: the class size; judicial economy arising from the avoidance of a multiplicity of actions; the ease of identification of members of the proposed class; the geographic dispersion of class members; the size of each plaintiff's claim; the financial resources of the class members; the ability of claimants to institute individual suits; and requests for prospective injunctive relief which would involve future class members; and any other factors relevant to the practicability of joining all the class members."  *Id.* (citing Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:6 (2002 & Supp. 2011)).

Here, joinder of all Class Members is impractical.  Defendants have identified 174 H-1B employees who had contracts with Defendants and were therefore subject to the liquidated damages and promissory note penalties and thus subject to Defendants' forced labor scheme.[12] *See* List of Class Members Identified by Defendants (Ex. 11).  Analysis of these employees' I-797 start dates, payroll start dates, contract wages, and payroll amounts indicate that at least 162 of the employees identified by Defendants were underpaid – *i.e.*, benched without pay and/or

---

[12] As previously noted, Defendants have failed to identify all of their H-1B employees.  *See* n.5, *supra*.

below contract rates.  *See* Summary Exhibit – Identification of Underpaid H-1B Employees (Ex. 31).

### b.  Plaintiffs Satisfy the Rule 23(a) Commonality Requirement.

Plaintiffs likewise satisfy the Rule 23(a)(2) commonality requirement.  A plaintiff need only show "[a] common nucleus of operative fact" to "satisfy the commonality requirement of Rule 23(a)(2)."  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (citation omitted). "Common nuclei of fact are typically manifest where … the defendants have engaged in standardized conduct towards members of the proposed class." *Id.*  However, "factual variations among class members' grievances do not defeat a class action." *Id.* (citation omitted).

Common questions of law and fact abound here.  As described above, Defendants engaged in a common course of conduct to ensnare Class Members in their forced labor scheme. As part of that scheme, Defendants required Class Members to sign contracts subject to liquidated damages provisions and promissory notes, thereby forcing the Class Members to remain employed by Defendants.  Defendants then failed to pay Class Members contractual wages, thus breaching contracts and violating the ISWL.  Common questions of fact include:

1.  Whether Defendants obtained labor from the Class by abuse or threatened abuse of legal process;

2.  Whether Defendants obtained labor from the Class by substantial harm or threats of substantial harm;

3.  Whether Defendants engaged in a scheme, plan, or pattern, to obtain forced labor;

4.  Whether Defendants paid Plaintiffs and Class Members less than their contract wages.

Common questions of law include:

5.  If yes to 1, 2, or 3, above, whether Defendants' conduct violated the TVPA;

6.  If yes to 4, above, whether Defendants' conduct violated the ISWL;

7.  If yes to 4, above, whether Defendants' conduct constituted a breach of contract;

8.  Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief.

Because these are central factual and legal questions to be determined in this case, Plaintiffs satisfy the Rule 23(a)(2) commonality requirement.

### c.  Plaintiffs Satisfy the Rule 23(a) Typicality Requirement.

Plaintiffs' claims are typical of those of the Class, and thus satisfy Rule 23(a)(3).  Closely related to the commonality inquiry, "[t]ypicality exists when the plaintiff's claim arises out of the 'same event or practice or course of conduct [that gives rise to the claims of other class members]' and when the same legal theories and defenses apply to said claims," *Cox*, 295 F.R.D. at 213 (quoting *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)); *accord Olson*, 284 F.R.D. at 410 (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted).  Accordingly, "[t]ypicality can be satisfied despite different factual circumstances." *Id.* (citation omitted).

Here, Plaintiffs and other Class Members suffered similar harm from Defendants' common scheme and pattern of conduct.  Defendants' scheme and pattern of conduct was designed to ensure that Plaintiffs and Class Members would suffer serious harm (*i.e.*, liability of a substantial sum) and/or adverse immigration-status consequences for terminating their employment.

Moreover, the same legal theories apply to Plaintiffs' and Class Members' claims.  Namely, Plaintiffs and the Class assert forced labor claims based on Defendants' abuse of legal process and threats of serious harm.  Plaintiffs and the Class also assert claims of underpayment

23

in violation of the ISWL and breach of contract related to contracts Defendants had Plaintiffs and each Class Member sign.

Because Plaintiffs' claims and those of the Class arise from the same practice and course of conduct by Defendants, and the same legal theories apply to said claims, the typicality requirement is satisfied.

### d. Plaintiffs Satisfy the Rule 23(a) Adequacy Requirement.

Plaintiffs and their counsel satisfy the Rule 23(a)(4) adequacy requirement.  To satisfy this requirement "(1) the class representative cannot have antagonistic or conflicting claims with other class members, (2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy, and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously."  *Cox*, 295 F.R.D. at 213; *accord Olson*, 284 F.R.D. at 412-13 (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *Rosario*, 963 F.2d at 1018; *Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981)).

Here, the interests of Plaintiffs and the Class are entirely aligned.  Plaintiffs and other Class Members were forced to sign standardized contracts and promissory notes and were employed under substantially similar conditions.   And they were impacted similarly by Defendants' forced labor and underpayment scheme.  Plaintiffs and the Class both stand to recover damages for Defendants' conduct and Plaintiffs and the Class both stand to benefit from injunctive and declaratory relief.  Plaintiffs have every motivation to vigorously advocate on behalf of the class and there is no evidence of any conflict of interest between Plaintiffs and the Class.  Finally, as discussed in Part III, *infra*, Plaintiffs' counsel is competent, experienced, and

qualified to conduct this litigation and advocate on behalf of the Plaintiffs and the Class. Accordingly, Plaintiffs satisfy Rule 23(a)(4)'s adequacy requirement.

### e. Plaintiffs Satisfy the Rule 23(b)(3) Predominance and Superiority Requirements.

"When certification is sought under Rule 23(b)(3) … proponents of the class must show: (1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner v. Northshore Univ. Heath Sys.*, 669 F.3d 802, 815 (7th Cir. 2012) (citing Fed. R. Civ. P. 23(b)(3)). Plaintiffs satisfy those requirements here.

### i. *Common Questions of Law and Fact Predominate.*

Plaintiffs satisfy the Rule 23(b)(3) predominance requirement. "Rule 23(b)(3)'s predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and … can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011). In other words, "common questions predominate if a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class." *Id.* (quoting *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* (citation omitted). The rule allows for individual questions and "requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.* Plaintiffs need not prove their case at class certification, but need only "demonstrate that [their claims are] *capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Id.* at 818 (citation omitted) (emphasis in original).

25

Here, Defendants' forced labor and underpayment scheme makes up the "common nucleus of operative facts," which is "capable of proof at trial" through common evidence. *Id.* at 815, 818. Further, as described in Part I(b), common questions predominate over individual issues.[13] "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause[s] of action." *Id.* at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)). Plaintiffs assert claims for forced labor under the TVPA, as well as underpayment of wages under the ISWL, and breach of contract. 3rd Am. Compl. ¶¶ 71-80.

To prove a claim under the TVPA, Plaintiffs must demonstrate that Defendants "knowingly obtain[ed] labor or services of a person by any one of, or by any combination of[:] serious harm or threats of serious harm [or] abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause the person that, if that person did not perform such labor or services, that person … would suffer serious harm." 18 U.S.C. § 1589(a)(2)-(4).[14] "[T]he TVPA inquiry will not turn on, or require, individualized determinations, [nor] look at how each Plaintiff [or Class Member] perceived Defendants' actions or whether he or she subjectively felt compelled to work." *Nunag-Tanedo v. E. Baton*

---

[13] "Courts have found significant overlap between the commonality requirement of Rule 23(a) and the predominance requirement [of Rule 23(b)(3)], such that 'a finding of commonality will likely satisfy a finding of predomination.'" *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 429 (N.D. Ill. 2007) (quoting *Ludwig v. Pilkington N. Am., Inc.*, No. 03 C 1086, 2003 WL 22478842, *4 (N.D. Ill. Nov. 4, 2003); *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141, *6 (N.D. Ill. Aug. 12, 2002)).

[14] "'Serious harm' means any harm … including psychological, financial, or reputational, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "'Abuse of law or legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

*Rouge Parish Sch. Bd.*, No. LA CV10-01172 JAK (MLGx), 2011 WL 7095434, *8 (C.D. Cal.

Dec. 12, 2011) (certifying TVPA class).   "Instead, the inquiry will look at the Defendants'

actions and assess how a reasonable person from the Plaintiffs' background would respond to

those actions."   *Id.*   Plaintiffs and the Class share similar "background[s]" and were placed in

similar "circumstances" through their employment with Defendants.   18 U.S.C. § 1589(c)(2).

Accordingly, a "fact-finder" may "use a common 'reasonable person' standard for all class

members."   *Nunag-Tanedo*, 2011 WL 7095434 at*8.   These "common questions … can be

resolved for all members of [the] class in a single adjudication."   *Messner*, 669 F.3d at 815

(citation omitted).

Next, common questions also predominate with regards to Plaintiffs' ISWL claims.   "The

Indiana Wage Law is intended to govern not only the frequency, but the amount an employer

must pay its employees."   *Panwar v. Access Therapies*, No. 1:12-cv-619-TWP-TAB, 2013 WL

5486783, *8 (S.D. Ind. Sept. 30, 2013) (further explaining, "[t]he parties agreed to the amount

that Mr. Panwar would be paid for his services in the Employment Agreement, and Defendants

allegedly failed to pay him that full amount … [this] situation is covered by the Indiana Wage

law") (citation omitted).   Under the ISWL, an employee is entitled "to liquidated damages of up

to double the amount of wages due," where an employer fails to pay the employee's wages as

agreed.   *Sheaff Brock Inv. Advisors, LLC v. Morton*, No. 29A02-1306-CC-553, 2014 WL

1349662, *5 (Ind. Ct. App. Apr. 7, 2014).   The amount of wages owed is a matter of contract

between the employer and the employee.   *St. Vincent Hosp. & Health Care Ctr.*, *Inc. v. Steele*,

766 N.E.2d 699, 704 n.4 (Ind. 2002).   Here, Plaintiffs and the Class signed contracts which

designated a specific amount of pay per pay period of work.   *See, e.g.*, Panwar Agreement at 3;

Agustin Agreement at 3.   Whether Defendants' underpayment of contractual wages for work

performed constituted a violation of the ISWL is a question common to the Class and capable of common proof.

For the same reasons, whether Defendants' underpayment of contractual wages constituted a breach of contract is also a question common to the class.[15]  *See Flanagan*, 242 F.R.D. at 428 (certifying 23(b)(3) breach of contract class and explaining, "[c]laims arising out of form contracts are particularly appropriate for class action treatment").  In *Flanagan*, the Court certified a class to determine contractual liability (*i.e.* breach), to be followed by individual hearings to determine damages.  *Id.* at 433.  Plaintiffs propose a similar approach here.  *See* Part II, *infra*.

In contrast to the critical common issues presented, there are few individualized issues. Plaintiffs' TVPA claim relies on objective, common evidence, and proof of Defendants' actions in carrying out their scheme.  Plaintiffs' ISWL and breach of contract claims both impose strict liability and may be proven with common evidence.  Accordingly, Plaintiffs satisfy the Rule 23(b)(3) predominance requirement.

### ii.  *Plaintiffs Satisfy the Rule 23(b)(3) Superiority Requirement.*

"In determining whether a class action is superior" to individual adjudications, courts look to "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class

---

[15] Defendants' contracts all designate Indiana law as governing.  *See, e.g.*, Panwar Agreement at 5; Agustin Agreement at 5.  Unlike in tort law, where liability "is balanced between the parties according to each's comparative fault, … when a party breaches his legal obligations under a contract, liability is  strict."  *Johnson v. Scandia Assocs., Inc.*, 717 N.E.2d 24, 29 (Ind. 1999). This makes a determination of liability for breach of contract relatively straightforward and well suited to class-wide determination.

action." *Young v. Fortis Plastics, LLC*, 294 F.R.D. 128, 139 (N.D. Ind. 2013) (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D)).

Here, these factors weigh heavily in favor of classwide adjudication.  To begin, Class Members are unlikely to have a strong interest in individually prosecuting their claims against Defendants.  First, while the potential recovery is not insubstantial, it is far below the expense of litigating an individual claim.  *See id.* (finding that members of the proposed class "likely have little interest in prosecuting … claims, due to the expense required and minimal individual recovery").  Second, Class Members are foreign-born individuals of modest means with little knowledge of the U.S. legal system and thus unlikely to bring claims on their own behalf.  Third, Defendants have succeeded in creating a culture of fear of retaliation among their employees for any actions taken against the company.  This practice goes hand-in-hand with Plaintiffs' underlying forced labor claim, and, as proven time and again over the course of this litigation, when an employee speaks out, or asserts rights against the Defendants, Defendants swiftly retaliate.  *See, e.g.*, Pls.' Witness Tampering Sanctions Brief at 2-3 (Dkt. No. 167).  In this context, there is little reason to believe Class Members will bring claims on their own behalf. Nor have other Class Members done so to date.

Next, it is highly desirable to concentrate this litigation in the Southern District of Indiana.  Defendants Access Therapies and RN Staff are incorporated in Indiana, both businesses are headquartered together in a single office in Indianapolis, and the individual Defendants all work regularly at this location.  Dhani Dep. Tr. 8:22-10:18; 12:16-13:6.  Furthermore, Defendants' employment agreements all designate Indiana law as governing. *See, e.g.*, Panwar Agreement at 5; Agustin Agreement at 5.

Finally, the proposed Class is eminently manageable, with several hundred members, easily ascertained from Defendants' records.  Moreover, a single action promotes efficiency and reduces litigation costs on all parties.  Multiple individual actions would likely present much greater manageability problems, including duplicative discovery, repeated adjudications of similar controversies (with attendant risk of inconsistent verdicts), and considerable cost.

Accordingly, Plaintiffs satisfy the Rule 23(b)(3) superiority requirement.

### f.  Plaintiffs Satisfy Rule 23(b)(2).

Rule 23(b)(2) permits classwide injunctive and declaratory relief.  Fed. R. Civ. P. 23(b)(2).  Certification under Rule 23(b)(2) is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011).  Such relief is possible where a defendant has "a policy or practice" – *i.e.*, "standardized conduct" – that applies to all members of a putative class. *Olson*, 284 F.R.D. at 415; *see Allen v. Int'l Truck and Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004) (discussing desirability of class-wide injunction in employment context).

As discussed above, Defendants have engaged in "standardized conduct" towards Plaintiffs and the Class.  Plaintiffs seek to enjoin Defendants' unlawful forced labor and underpayment scheme and obtain declaratory judgment regarding Defendants' systematic underpayment of their employees.  3d. Am. Compl., Prayer for Relief ¶¶ i-j.  Such equitable relief would entail an injunction on Defendants' use of threats of deportation, visa-related consequences, and promissory note liability against its employees.  This relief would also necessarily entail a declaration that Defendants' existing promissory notes and liquidated damages provisions be declared null and void.  Without this relief, Defendants would be able to continue exerting undue influence on its employees and thereby perpetuate its forced labor

scheme.  Finally, this relief would necessarily entail a declaration that Defendants must pay employees the wages stipulated in employee contracts, and that failure to do so constitutes a breach of said contracts and a violation of the ISWL.

The equitable relief sought would apply to the Class as a whole, and certification is appropriate under Rule 23(b)(2).  *See Allen*, 358 F.3d at 471-72 (certifying Rule 23(b)(2) class).

## II.    BIFURCATION IS APPROPRIATE UNDER RULE 23(c).

Plaintiffs propose that the Court certify the Class on the issues of liability, Class entitlement, method for calculating, and amount of punitive damages, and injunctive relief, followed by an individualized proceeding to determine the allocation of punitive damages, compensatory damages, and/or restitution for each Class Member.  "It is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members."  *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 233 (7th Cir. 1983).  Moreover, "[t]he necessity of answering individual questions after answering common questions will not prevent a class action."  *Heastie v. Comm. Bank of Greater Peoria*, 125 F.R.D. 669, 675 (N.D. Ill. 1989).  "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues," such as "bifurcating liability and damages trials," or "appointing a magistrate or special master to preside over individual damages proceedings."  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (Certifying liability-only class and explaining "Rule 23(c)(4) provides that 'when appropriate, an action may be brought or maintained as a class action with respect to particular issues'").  The Seventh Circuit has repeatedly endorsed this approach.  *See, e.g.*, *id.*; *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying

31

a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individual assessments"); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) ("Although the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts").[16]

Damages for Class Members can be determined during a single hearing.  Once liability, entitlement to punitive damages, and the method for calculating an amount of punitive damages are established,[17] individual compensatory and punitive damages, and/or restitution can be proven per Class Member using only a few key pieces of evidence.  These will include Class Members' contracts establishing their contract rate of pay, initial I-797 forms, establishing their start dates, and payroll records, establishing periods and amounts of underpayment.  Employees' initial I-797 validity dates should be considered their start dates for at least three reasons.  First, in order for an employee to obtain an I-797, an employer must file an I-129 form, under penalty of perjury, identifying the employee-beneficiary, attesting that a position is available, and confirming the start and end dates of employment.  Sample I-129 Form at 3, 5-6 (Ex. 32). USCIS then uses this start date as the I-797 validity date, 8 CFR 214.2(h)(9)(ii), and the I-797

---

[16] *See also Allen*, 358 F.3d at 471-72 ("Certifying a class for injunctive purposes, while handling damages claims individually, does not transgress the seventh amendment," and further explaining that "it would be prudent for the district court to reconsider whether at least some of the issues bearing on damages – such as the existence of plant-wide racial animosity … could be treated on a class basis … even if some other issues, such as assessments of damages for each work, must be handled individually"); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 912 (7th Cir. 2003) (affirming certification of Rule 23(b)(3) class and explaining "[t]he individual class members will still have to prove the fact and extent of their individual injuries"); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) (discussing utility of "[d]ivided certification").

[17] For example, the jury may determine that each Class Member is entitled to a specific quantum of punitive damages, or it may determine that each Class Member should receive a certain multiple of his or her compensatory damages in punitive damages (*e.g.*, 3 times).

validity date is the date the employee is presumed to begin work, 8 CFR 214.2(h)(13)(i)(A). Thus, Defendants affirmed, under penalty of perjury, that they intended their employees to begin on their I-797 validity dates, and employees are legally presumed to begin work on their validity dates. Second, employees sign their employment agreements well in advance of the I-797 date and are thus contractually obligated to begin work upon the date of their visa approval – *i.e.*, the I-797 validity date. *See* Panwar Agreement at 4; Agustin Agreement at 4. Finally, Defendants have engaged in a willful and coordinated effort to obstruct discovery and tamper with witnesses. *See* Pls.' Mot. for Witness Tampering Sanctions (Dkt. Nos. 166-67, 177). As a result, Plaintiffs have been unable to obtain essential e-mails that would otherwise help establish Class Member start dates. *See* Pls.' Witness Tampering Reply at 18-19 (Dkt. No. 177). Accordingly, the I-797 validity date is a wholly appropriate start date, and would permit a straightforward and simple calculation of damages.

## III.   PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL.

Rule 23(g) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, Rule 23(g) instructs that the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Since initiating this action in May 2012, counsel for Plaintiffs have expended substantial time and resources vigorously litigating this case on behalf of Plaintiffs and the proposed Class.[18] Plaintiffs' counsel will continue this vigorous representation should a Class be certified.

Moreover, Plaintiffs' counsel have extensive experience litigating class actions and other complex matters in federal court. *See, e.g.*, Firm Resumes for Kotchen & Low LLP and DVG Law Partner (Ex. 33). Plaintiffs' counsel have also extensively practiced, researched, and/or familiarized themselves with the substantive law applicable in this case.

Finally, Plaintiffs' counsel is the sole applicant for class counsel, and, as discussed, satisfy each of the requirements of Rule 23(g)(1) and (4). *See* Fed. R. Civ. P. 23(g)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs satisfy the requirements of Rules 23(a) and 23(b). Accordingly, Plaintiffs' Motion for Class Certification should be granted, and, pursuant to Rule 23(g), Plaintiffs' counsel should be appointed Class Counsel on behalf of the certified class.

---

[18] These efforts have included: (a) issuing discovery requests to Defendants, (b) organizing and reviewing discovery produced by Defendants, (c) preparing for and taking depositions of Defendants and other witnesses, (d) responding to Defendants' discovery requests, (e) opposing two motions to dismiss filed by Defendants, (f) successfully moving to dismiss Defendants' counterclaim against Mr. Panwar, (g) researching and writing the present motion and supporting brief, (h) researching and writing Plaintiffs' Motion for Partial Summary Judgment, (i) corresponding with Defendants, (j) participating in hearings and conferences with the Court, (k) litigating sanctions issues related to Defendants' extensive discovery misconduct, and (l) addressing a host of other procedural, organizational, and substantive issues.

34

Date:   May 9, 2014                    Respectfully submitted,


                                       /s/Michael F. Brown
                                       Michael F. Brown
                                       DVG LAW PARTNER LLC
                                       P.O. Box 645
                                       Neenah, WI 54957
                                       920-238-6781
                                       920-273-6177 (fax)
                                       mbrown@dvglawpartner.com

                                       Daniel A. Kotchen
                                       KOTCHEN & LOW LLP
                                       1745 Kalorama Road NW
                                       Suite 101
                                       Washington, DC 20009
                                       (202) 416-1848
                                       (202) 280-1128 (fax)
                                       dkotchen@kotchen.com
                                       dlow@kotchen.com

                                       Vonda K. Vandaveer
                                       V.K. Vandaveer, P.L.L.C.
                                       P.O. Box 27317
                                       Washington, DC 20038-7317
                                       202-340-1215
                                       202-521-0599 (fax)
                                       atty@vkvlaw.com

                                       Andrew P. Wirick
                                       HUME SMITH GEDDES GREEN & SIMMONS,
                                       LLP
                                       Attorney No. 11362-49
                                       54 Monument Circle, 4th Floor
                                       Indianapolis, Indiana 46204
                                       Telephone: (317) 632-4402
                                       Facsimile: (317) 632-5595
                                       awirick@humesmith.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filings to Defendants' counsel of record in the Court's CM/ECF system.

<u>/s/Michael F. Brown</u>
*Counsel for Plaintiffs*