**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| RITURAJ SINGH PANWAR, and<br>MICHAEL RICHARD<br>BAUTISTA AGUSTIN,<br>on behalf of themselves<br>and all others similarly situated, | )<br>)<br>)<br>)<br>) | |
| | ) | Case No.: 1:12-cv-00619-TWP-TAB |
| | ) | |
| | ) | **CLASS ACTION** |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| ACCESS THERAPIES, INC.,RN STAFF, INC.,<br>d/b/a REHABILITY CARE, RAMON VILLEGAS,<br>MANUEL GARCIA, and HARVINDER DHANI | )<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. 2

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ....................................... 3

STANDARD OF REVIEW ........................................................................................... 17

ARGUMENT ................................................................................................................. 17

    A. Defendants Forced Plaintiffs' Employment in Violation of the TVPA. ............. 17

    B. Defendants Violated the ISWL and Breached Plaintiffs' Contracts. ................. 23

CONCLUSION .............................................................................................................. 24

Plaintiffs Rituraj Singh Panwar and Michael Agustin ("Plaintiffs"), by their undersigned attorneys, submit the foregoing Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment.  Material facts not in dispute demonstrate that Defendants forced Plaintiffs to keep working for Defendants in violation of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589-1590, 1593, 1595 ("TVPA").  Accordingly, summary judgment should be granted on the issue of Defendants' liability on Plaintiffs' TVPA claims.  Moreover, material facts not in dispute demonstrate that the Corporate Defendants (Access Therapies, Inc. and RN Staff Inc.) underpaid Plaintiffs in breach of their contracts and in violation of Indiana Statutory Wage Law, Ind. Code § 22-2-5-2 ("ISWL").  Accordingly, summary judgment should be granted on the issue of the Corporate Defendants' liability to Plaintiffs for breach of contract and violation of the ISWL.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

*The Defendants*

(1)    "Access Therapies is a countrywide healthcare recruiting and staffing company." (Ex. 38).  Access Therapies claims to "have hundreds of positions open all across the country." *Id.*

(2)    RN Staff "provide[s] flexible staffing options to both healthcare professionals and the companies to whom they provide service[.]"  (Ex. 39).

(3)    Access Therapies and Rehability Care share the same owners, management, and office space. Dhani Dep. Tr.  8:22-10:18; 12:16-13:18 (Ex. 37).

(4)    Harvinder Dhani, at all relevant times, has been the Chief Operating Officer, a manager, principal decision-maker for Access Therapies and RN Staff, and in his words "Access and RN Staff are managed exclusively by me. There are no other managers."  Dhani Dep. Tr. 10:12-10:16; Dhani Decl. ¶ 7 (Dkt. No. 137-1).

3

(5)     Manuel Garcia, at relevant times, has been President of Access Therapies, and a corporate director and a shareholder with 20% company ownership of Access Therapies and RN Staff. Dhani Dep. Tr.  8:22-10:18; 12:16-13:18; Garcia Decl. ¶ 3 (Dkt. No. 176-3).

(6)     Ramon Villegas, at relevant times, has been a recruiter and manager for Access Therapies and RN Staff.  Villegas Decl. ¶ 3 (Dkt. No. 176-4).

(7)     Defendants require employees to sign contracts containing liquidated damages provisions[1] and promissory notes that require the employees to pay Defendants a specific sum (*e.g.*, $15,000 or $20,000) if employees fail to complete their contract terms with Defendants. *See, e.g.,* Agustin Agreement at 4 (Ex. 6); Panwar Agreement at 4 (Ex. 4); Agustin Promissory Note at 1 (Ex. 7); Panwar Promissory Note at 1 (Ex. 5).  The liquidated damages provision of the contracts is triggered upon the date on which Defendants submit to the federal government a visa application known as an I-129 petition.  Agustin Agreement at 4; Panwar Agreement at 4.

(8)     Defendants "routinely" sue employees who quit prior to a contract term for the amount due under the liquidated damages provision and promissory note.  Dhani Decl. ¶ 9 (Dkt. No. 137-1) (attesting that "lawsuits against former employees for breach of contract" are "matters [of] routine."); Defs.' Marion County Complaint against Erickson Mendoza (Dkt. No. 120-2); *see also* Licupa Decl. ¶¶ 10-11 ("I ended my employment with Access Therapies on February 8, 2011. Access Therapies sued me in April 2011 in Marion County Court, seeking at least $13,000 for breach of contract") (Dkt. No. 167-1).  For example, since 2006, Defendants have filed at least 94 lawsuits in Marion County court, the vast majority of which are suits

---

[1] For simplicity sake, Plaintiffs refer to Defendants' provisions as "liquidated damages" provisions, even though they act as penalty provisions. *See Dean v. Kruse Foundation, Inc. v. Gates*, 973 N.E. 2d 583, 591 (Ind. Ct. App. 2012) ("The distinction between [an unenforceable] penalty provision and one for [enforceable] liquidated damages is that a penalty is imposed to secure performance of the contract and liquidated damages are to be paid in lieu of performance.").

against individuals.  Marion County Docket Report (Dkt. No. 132-2); Marion County Docket Report (Dkt. No. 98-16).

(9)     Access Therapies' year 2009 Federal tax filings reported $15,028,582 in gross receipts or sales and $3,209,377 in gross profit.  Defs.' Financial Documents at 5 (Ex. 12). Access Therapies' year 2010 Federal tax filings reported $17,367,609 in gross receipts or sales and $2,968,898 in gross profit.  *Id.* at 1.  Access Therapies' Profit & Loss statement for January 1 through December 28, 2011 reported $17,269,807.34 for total staffing revenue and $3,129,849.65 in gross profit.  *Id.* at 12-13.[2]

***Plaintiff Raj Panwar***

(10)     Mr. Panwar is a citizen of India, and currently resides in Cortland, New York. Panwar Decl. ¶ 1 (Ex. 1). He earned a Master's degree in Kinesiology from Southeastern Louisiana University and a second Master's degree in Hospital Management from the University of New Orleans.  *Id.*

(11)     After Mr. Panwar responded to an Access Therapies online advertisement and applied for a position, Access Therapies offered Mr. Panwar a job, which he accepted. *Id.*, ¶ 2. On April 21, 2010, Mr. Villegas sent an e-mail (Ex. 40) on behalf of Access Therapies to Mr. Panwar that attached an Access Therapies employment contract and promissory note for Mr. Panwar's review and signature.  Panwar Decl. ¶ 2.  On June 8, 2010, Mr. Villegas sent an e-mail (Ex. 41), again on behalf of Access Therapies, to Mr. Panwar that replaced the Access Therapies contract and promissory note with an RN Staff, Inc. (d/b/a Rehability Care) employment contract

---

[2] These financial documents were produced by attorney Karl Shehu, in response to a subpoena from Plaintiffs.  The subpoena requested production of tax and financial documents attorney Shehu had received from Defendants.

and promissory note for Mr. Panwar's review and signature.  Panwar Decl. ¶ 2. Mr. Panwar

signed the RN Staff employment contract and promissory note.  *Id.*

(12)    The RN Staff contract term was "TWO YEARS (4160 hours of work)."  Panwar

Agreement at 1.  Under the contract, Mr. Panwar would be paid "$800-$1,000 net pay per

week."  *Id.* at 3.  In addition, Mr. Panwar was obligated "to work as soon as [he] got *[sic]* the

working permit &/or working visa or as long as [he] can legally work for the employer

whichever comes first."  Panwar Agreement at 6.

(13)    The RN Staff contract contained the following provision:

> If the Employee leaves his/her employment before the completion
> of the two years initial term of employment, Employee shall pay
> all liquidation cost incurred by the Company, $20,000 plus all
> costs associated with collection, or litigation, plus interest, court
> cost and Attorney's fees, whether or not a lawsuit is commenced as
> part of the collection process.  The term should be effective upon
> actual filing of the I-129 petition.

Panwar Agreement at 4.

(14)    Similarly, the RN Staff Promissory Note contained the following provision:

> **PROMISE TO PAY:  Rituraj Singh Panwar** ("Employee")
> promise *[sic]* to pay to **Rehability Care** of Indiana ("Employer"),
> or order, in lawful money of the United States of America, the
> principal amount of **Twenty Thousand/100 Dollars ($20,000)**
> together with interest at the rate of **10.00%** per annum on the
> unpaid principal balance until paid in full, if the Employee failed to
> finish the contract that he signed with Rehability Care 2 years
> (4160 hours).

Panwar Promissory Note at 1.

(15)    On or around June 10, 2010, to secure an H-1B visa for Mr. Panwar, RN Staff

filed a "Labor Condition Application" ("LCA") with the Department of Labor and the U.S.

Citizenship and Immigration Services.  Panwar LCA (Ex. 35). In the LCA, RN Staff attested

under penalty of perjury (a) it had a paid "REHABILITATION COORDINATOR" position

available for Mr. Panwar for a three-year period in Bellmore, NY, and (b) that it would pay Mr. Panwar  for "non-productive time." Panwar LCA at 2, 4.[3]

(16)     RN Staff filed Mr. Panwar's I-129 petition on July 8, 2010.  Panwar I-797A at 1 (indicating receipt date of July 8, 2010) (Ex. 13).   Thus, as of July 8, 2010, Mr. Panwar was obligated to pay RN Staff a minimum of $20,000 if he did not complete his two year, 4,160 hour term with the company.  Panwar Agreement at 6.

(17)     Mr. Panwar's I-129 petition was approved and he received an I-797 with an April 5, 2011 validity date. Panwar I-797A at 1.  He could thus begin working for RN Staff on April 5, 2011, and was available to do so.  Panwar Decl. ¶ 3; 8 CFR 214.2(h)(13)(i)(A).

(18)     Contrary to its representation to the federal government in its LCA, RN Staff did not have a "Rehabilitation Coordinator" position available for Mr. Panwar.  Panwar Decl. ¶ 3; Panwar LCA at 2, 4.

(19)     On April 8, 2011, Mr. Villegas informed Mr. Panwar that his H-1B visa was approved.  E-mail from R. Villegas to R. Panwar (Apr. 8, 2011) (Dkt. No. 1-2 at 1-4).  As of this date, Mr. Panwar was eligible for a one-year temporary physical therapist license, but Mr. Villegas encouraged Mr. Panwar not to apply for a temporary license, but instead to study for and take the National Physical Therapy Exam ("NTPE"):

> Since the NPTE is just around the corner, perhaps it would be best that you concentrate on your studies to ensure that you will pass the exam.  If you pass, we need not go through the tedious process of applying for a temporary license in the first place.

*Id.*

---

[3] Mr. Garcia is listed as the "Point of Contact" in Mr. Panwar's LCA who is "authorized to act on behalf of the employer in labor certification matters."  Panwar LCA at 3.

(20)    Mr. Panwar thus focused on studying for the NPTE.  Panwar Decl. ¶ 4.  In doing so, he was not being paid by RN Staff.  *Id.*  He also sought paid client work to be assigned from Defendants, as he did not have savings. *Id.* ¶ 5; *see, e.g.,* Email String at 1 (May 26, 2011) ("Attached is my updated resume.  I would be interested to work somewhere in upstate NY.") (Ex. 42).

(21)    Defendants did not provide paid work.  Panwar Decl. ¶¶ 4, 7. Mr. Panwar thus sought "financial assistance," but was told that financial assistance was not available until he passed the NPTE.  2d Email String at 1 (May 26, 2011) (Ex. 14) (email from Mr. Panwar to Mr. Villegas asking for "financial assistance" and Mr. Villegas email to Mr. Garcia at his accessinternational08@gmail.com address questioning "We tell [Mr Panwar] that we cannot provide financial assistance till we get the results of the NPTE?"); Dhani Dep. Tr. at 25:12-24, Dep. Ex. 4 (confirming accessinternational08@gmail.com email address belongs to Mr. Garcia).

(22)    Mr. Panwar's financial situation was dire.  Panwar Decl. ¶ 6.  By August, he was asked to leave a friend's house where he was staying for free and moved in with his cousin.  *Id.* In August, Mr. Panwar took and passed the National Physical Therapy Assistance Exam, thus receiving a Physical Therapy Assistant ("PTA") license.  *Id.*; Email String at 3 (Aug. 15-16, 2011) (Ex. 15) (Mr. Panwar email to Mr. Villegas, stating "And I m [sic] glad to inform you that I have cleared the physical therapy assistant license exam.").

(23)    Upon Mr. Villegas being notified that Mr. Panwar passed the exam, on August 15, 2011, Mr. Villegas inquired of Mr. Garcia and other employees of Defendants whether it "would [] be possible to place him as a PTA in NY while he still tries to take the NPTE" and whether Defendants' "marketing team" could "prioritize him for placement." Email String at 1 (Aug. 15, 2011) (Ex. 16); Dhani Dep. Tr. at 25:12-24, Dep. Ex. 4.  Later that day, Mr. Villegas

informed Mr. Panwar that he should still focus on passing the "PT licensure exam" since Mr.

Panwar was more valuable as a licensed physical therapist as opposed to a physical therapy

assistant:

> Congratulations on passing the PTA licensure exam!   Will coordinate Marketing on possible placements for you but we still want you to pursue the PT licensure exam since we know that you can earn more if you have a PT license compared to a PTA license. Don't you think it would be wiser to wait and prepare for the September 7 NPTE (3 weeks away) rather than start on new work?

Email String 2011 at 2 (Aug. 15-16, 2011).

(24)    Mr. Panwar responded that he would "highly appreciate[]" if Defendants could

find a "PTA job" while he continued to study for the NPTE.  *Id.* at 2-3.  But Mr. Villegas re-

confirmed that "the exam is always the priority" and that Mr. Panwar should not "try[] to

accomplish . . . adjustment to a new job[.]"  *Id.* at 1.

(25)    Defendants did not place Mr. Panwar in a paid position until December 5, 2011,

at which point he started being paid weekly. Panwar Decl. ¶ 7.  But Defendants routinely paid

Mr. Panwar less than the $800 to $1,000 net pay per week to which he agreed in the contract. *Id.*;

Panwar Payroll Report 2011 (Ex. 17); Panwar Payroll Report 2012 (Ex. 18).

(26)    Between April 5, 2011 and December 4, 2011 – an eight-month period –

Defendants did not pay any wages to Mr. Panwar.  Panwar Decl. ¶ 7.  During these eight months,

Mr. Panwar performed extensive duties for Defendants, such as participating in web-based

training required by the company, studying for exams, communicating frequently with

Defendants, completing formwork, searching for paid client projects, working on resumes and

client applications, attending client interviews, and other activities. *Id.* ¶ 8. Mr. Panwar informed

Defendants that he was performing these tasks and Defendants approved of them. *Id.*

(27)     The stress of the eight-month period of no pay took its toll.   During this period, Mr. Panwar had daily anxiety and stress, daily headaches, bouts of crying, five to fifteen pounds of weight loss, and considerable hair loss.   Panwar Dep. Tr. at 189:6-23, 194:7-201:11 (Ex. 19). In addition, Mr. Panwar moved between friends' (and a cousin's) homes because he could not afford rent, was forced to borrow money from his cousin, and to charge significant amounts to his credit cards.   *Id.* at 19:6-29:10, 31:14-33:4; 34:20-37:3.

(28)     For two reasons, Mr. Panwar was forced to remain employed by Defendants. Panwar Decl. ¶ 10.   First, if he quit, he would owe RN Staff a minimum of $20,000. *Id.*; Panwar Agreement at 4; Panwar Promissory Note at 1.   Mr. Panwar is a visa worker who agreed to work for net pay of $800 to $1,000 per week.   Panwar Decl. ¶ 10. He could not afford to pay RN Staff $20,000 if he quit.   *Id.*   Thus, the liquidated damages clause and promissory note forced Mr. Panwar to remain with Defendants, even though he was not paid for an eight-month period and then underpaid thereafter   *Id.*

(29)     Second, if he quit, Mr. Panwar risked deportation.   Mr. Panwar's H-1B visa allowed him only to work for RN Staff.   INA § 237(a)(1)(C)(i).   Thus, if he quit – or otherwise lost his job – Mr. Panwar risked and feared being deported to India.   Panwar Decl. ¶ 10.

(30)     On at least two occasions, when dissatisfied with Mr. Panwar's actions, Defendants threatened Mr. Panwar with the potential loss of visa (which likely would have led to his being deported).   *Id.* ¶ 11.   In June 2011, in response to Mr. Panwar's frequent calls regarding the status of his job placement, Mr. Villegas threatened to revoke Mr. Panwar's visa if he kept asking about his job placement. *Id.*   In addition, on May 9, 2012, the same day that Defendants were served with Mr. Panwar's lawsuit, Mr. Villegas left Mr. Panwar voice messages threatening to terminate his employment and revoke his visa because he had made "a very wrong move" in

filing his legal complaint. *Id.*; *Audio Exs. 1-2.* In the message, Mr. Villegas stated "Hi Raj, this is Ramon Villegas of Access Therapies... They're asking me to give you a call and let you know if you do not give us a call back in the office, we'll be forced to cancel your visa effective tomorrow... I hope you understand that we did our part to help you. And going this route, it's a very wrong move on your part... Please don't do this. Give me a call back in the office..." Panwar Decl. ¶ 11, *Audio Ex. 1.* On that same day, Mr. Villegas left a second message in which he stated: "Hey Raj, this is Ramon. I was hoping you could talk before lawyers get into the picture. I don't understand what's going on right now, and these thoughts in your head... This is your last opportunity to talk to us outside, you know, of any legal issues as with regards to lawyers, immigration. ... Hope to hear from you before midnight tonight... And I don't want a lawyer calling me again. Thank you. Bye bye." Panwar Decl. ¶ 11; *Audio Ex. 2.*

(31)  The next day, May 10, 2012 at 4:33pm, Defendant Villegas notified Mr. Panwar via e-mail that "Effective today, May 10, your employment with the company has been terminated." Panwar Decl. ¶ 12; Email from R. Villegas to R. Panwar (May 10, 2012) (Ex. 43).

***Plaintiff Michael Agustin***

(32)  Mr. Agustin is a citizen of the Philippines, and currently resides in Trinity, Florida. Agustin Decl. ¶ 1. He earned a Bachelor's degree in Physical Therapy from Far Eastern University in Quezon City, Philippines. *Id.* Mr. Agustin is a licensed physical therapist. *Id.*

(33)  In 2009, Mr. Agustin was living in the Philippines and applied for a position with Access Therapies. *Id.* ¶ 2. Access Therapies offered him a job, and he accepted. *Id.* In April 2009 Access Therapies sent Mr. Agustin a contract and promissory note that Access Therapies had prepared, and to which Mr. Agustin agreed. *Id.*

(34)    The Access Therapies contract term was "THREE YEARS (6240 hours of work) after [Mr. Agustin] receives his/ her visa and arrives in the U.S.A."  Agustin Agreement at 1. Under the contract, Mr. Agustin would be paid "$27 - $35 per hour."  *Id.* at 3.

(35)    The Access Therapies contract contained the following provision:

> If the Employee leaves his/her employment before the completion of the three years initial term of employment, Employee shall pay all cost incurred by the Company, $15,000 plus all costs associated with collection, or litigation, plus interest, court cost and Attorney's fees, whether or not a lawsuit is commenced as part of the collection process.  The term should be effective upon actual filing of the I-129 petition.

*Id.* at 4.

(36)    Similarly, the Access Therapies promissory note contained the following provision:

> **PROMISE TO PAY: Michael Richard B. Agustin** ("Employee") promise to pay to Access Therapies, INC. of Indiana ('Employer"), or order, in lawful money of the United States of America, the principal amount of **Fifteen Thousand/100 Dollars** [sic] **($15,000.00)** together with interest at the rate of **10.00%** per annum on the unpaid principal balance until paid in full, if the Employee failed to finish the contract that he signed with Access.

Agustin Promissory Note at 1.

(37)    To secure an H-1B visa for Mr. Agustin, Access Therapies filed a "Labor Condition Application" ("LCA") with the Department of Labor and the U.S. Citizenship and Immigration Services.  LCA Documentation Agustin at 7 (Ex. 20).  In the LCA, RN Staff attested under penalty of perjury (a) it had a paid "PHYSICAL THERAPIST" position available for Mr. Agustin for a three-year period in St. Petersburg, FL, and (b) that it would pay Mr. Agustin for "non-productive time." *Id.*[4]

---

[4] Exhibit 20 includes Access Therapies' LCA documents for Mr. Agustin, as they were produced to Plaintiffs by Defendants.  The last page of Exhibit 20 reflects the Physical Therapist position

(38)   Access Therapies filed Mr. Agustin's I-129 petition on May 4, 2009.  Agustin I-797B at 1 (Ex. 21) (indicating receipt date of May 4, 2009).  Thus, as of May 4, 2009, Mr. Agustin was obligated to pay Access Therapies a minimum of $15,000 if he did not complete his three-year, 6,240 hour term with the company.  Agustin Agreement at 4 (Article VI "Recovery of Expenses", providing "term should be effective upon actual filing of the I-129 petition").

(39)   On August 10, 2009, Eve Graue, a Recruiter for Access Therapies, informed Mr. Agustin that his H-1B visa was approved. Agustin Decl. ¶ 3; Email Ms. Graue at 1 (Aug. 10, 2009) (Ex. 22).

(40)   Mr. Agustin's I-129 petition was approved and he received an I-797 with an October 1, 2009 validity date.  Agustin I-797B at 1.  He could thus begin working for Access Therapies on October 1, 2009, and was available to do so.   Agustin Decl. ¶ 4; 8 CFR 214.2(h)(13)(i)(A).

(41)   Mr. Agustin thus relocated from the Philippines to the United States, arriving on September 28, 2009.  Agustin Decl. ¶ 4.

(42)   Contrary to its representation to the federal government in its LCA, Access Therapies did not have a "Physical Therapist" position available for Mr. Agustin.  *Id.* ¶ 5.  Mr. Agustin was not aware of this fact until after his employment began.  *Id.*

(43)   Upon starting at Access Therapies on October 1, 2009, Mr. Agustin was not paid because Access Therapies did not have a paying client to which to assign him.  *Id.* ¶ 6.

(44)   By October 26, 2009, Mr. Agustin's financial situation was dire and he emphasized to Access Therapies his need to start an assignment.  *Id.* ¶ 8; Email String at 2 Oct.

---

Access Therapies represented to the government was available upon Mr. Agustin's start of employment.  Further, as reflected on pages 2-6 of Exhibit 20, LCA formwork requires that a sponsoring employer attest that it will pay the employee for "non-productive time."

13

26-27, 2009) ("I arrived in Indiana last September 28, 2009 so hopefully you will be able to assign me as soon as you can. I'm already running out of funds and I'm very much ready to start working."); ("Mam, please help me to request for mam Eugene to deploy me as soon as she can. I'm running out of funds. I'll wait for your email. Thank you.") (Ex. 23)

(45)    On October 27, 2009, Access Therapies responded to Mr. Agustin that it was "working hard" to try to find him a paid assignment and asked he "be patient:"

> I have several clients in FL looking for PT's however every time I submitted your resume I was turn down they are looking for more experience PT or with U.S. experience.  Please be patient I am working hard to get you place.  Thanks.

*Id.* at 1-2.

(46)    On November 4, 2009, Mr. Agustin was assigned to work for a paying third-party client and finally began receiving weekly paychecks from Access Therapies. Agustin Decl. ¶ 9. During the October 1 to November 3, 2009 period in which he was not paid by Access Therapies, Mr. Agustin performed extensive duties for Defendants, such as participating in three full days of orientation activities at Access Therapies' facility, CPR training, studying for exams, communicating frequently with Defendants, completing formwork, searching for paid client projects, working on resumes and client applications, attending client interviews, and other activities. *Id.* ¶ 7. During this time, he performed up to 30 hours of work per week of these activities.  *Id.*

(47)    Mr. Agustin's paid assignment ended on November 9, 2012.  *Id.* ¶ 9.  He then endured a second extended period in which he received no pay from Access Therapies.  *Id.* ¶ 10.

(48)    By November 26, 2012, Mr. Agustin had gone two weeks without pay and could not continue to support his family.  E-mail String M. Agustin and Defendants at 2-3 (Nov. 26-27, 2012) (Ex. 24).  By this point, he was living off of funds that he had borrowed from his mother-

in-law. Agustin Decl. ¶ 11.   Access Therapies had a short-term position 378 miles away in Crestview, FL, but the cost of short term housing in Crestview was too expensive considering Mr. Agustin's hourly wage.  *Id.* ¶ 11; E-mail String M. Agustin and Defendants at 2-3 (Nov. 26-27, 2012).  Thus, considering that he had only nine weeks left on his contract, Mr. Agustin asked to be "released" from his contract – "without paying the penalties" – so that he could "move on to another employer:"

> [I]t's been 2 weeks now that I have no pay/salary and you know I have expenses/bills to pay.  It is really hard because I'm the only one working and I have to support my wife and my family in the Philippines who depend on me.  In view of this, I hope you understand, that I would like to request for Access, to formally release me from the contract (without paying the penalties), so that I can move on to another employer[.]

*Id.*

(49)   Manny Garcia from Access Therapies declined Mr. Agustin's request and informed Mr. Agustin that he could either "work with [Access Therapies] on [his] next assignment or [he could] settle [his] account with [Access Therapies] to release." *Id.* at 2.  Mr. Agustin then inquired how to prorate the $15,000 penalty if he left Access Therapies considering that he only had "9 weeks or 356 hours left" in his contract.  *Id.* at 1.  Mr. Garcia informed Mr. Agustin that the $15,000 penalty was not "set up" to be prorated, such that he would owe the entire amount if he left.  *Id.*  ("I don't think our contract was set up for prorated penalty. Whatever the penalty in the contract is what it is.").

(50)   A $15,000 "penalty" was "too expensive" so that Mr. Agustin was forced to remain employed by Access Therapies, informed the company that he would take any assignment, and asked for "bench pay or salary" during the period in which he was not assigned paid project work:

> I checked the contract and the total amount of penalty is $15,000 if I breach the contract and that is too expensive so I will not be able to settle my account.  I emailed Ma'am Eugene today and told her I'm willing to be assigned anywhere here in FL that there is an opening.  I have been helping her to look for an assignment/work and will continue to help her.  But as of now that I have no assignment, is it possible that you can give me a bench pay or salary?  I have bills to pay and expenses to cover and I've been out of work since November 9th.

*Id.*

(51)    Except for two days in early January (January 8 and 10), Mr. Agustin was not assigned to another paid project – and was not paid – until January 21, 2013.  Agustin Decl. ¶ 13. This project ended on March 22, 2013.  *Id.*  Mr. Agustin then left Access Therapies.  *Id.*  His contract term had recently ended as of the point he left.  *Id.*

(52)    For two reasons, Mr. Agustin was forced to remain employed by Defendants even when he experienced periods of no pay.  Agustin Decl. ¶ 14.  First, if he quit, he would owe Access Therapies a minimum of $15,000.  *Id.*  Mr. Agustin was "scared" by the prospect of paying the "huge" $15,000 penalty from the time he first saw it, and told an Access Therapies representative it was "expensive" and "if something happens, I won't be able to do [pay] it." Agustin Dep. at 21:13-15, 61:4-62:14 (Ex. 25). Co-workers reinforced his fears, as he heard from others at Access Therapies than the company aggressively enforced their promissory notes and contracts and regularly sued employees who left before completing their contract terms. Agustin Decl. ¶ 14.  This contributed to his fear that he would owe Access Therapies a minimum of $15,000 if he left before completing his contract term.  *Id.*

(53)    Second, if he quit, Mr. Agustin risked deportation back to the Philippines. Agustin Decl. ¶ 16.  Mr. Agustin's H-1B visa allowed him only to work for Access Therapies.  INA § 237(a)(1)(C)(i).  Thus, if he quit – or otherwise lost his job – Mr. Agustin risked deportation.

**STANDARD OF REVIEW**

Summary judgment may be granted if there are no genuine issues of material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).[5] The moving party bears the initial burden of demonstrating there is a lack of genuine issue of material fact.  *Id.*  A "genuine" issue exists only if sufficient evidentiary basis exists upon which a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A "material" factual dispute exists only if that factual dispute might affect the outcome of the suit under governing law.  *Id.* at 248; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After a motion for summary judgment is submitted, the non-moving party may not rest upon mere allegations or denials from its pleadings, but must set forth specific facts and evidentiary material showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  For reasons discussed herein, indisputable material evidence shows that Defendants forced Plaintiffs to remain in Defendants' employ in violation of the TVPA and the Corporate Defendants failed to pay Plaintiffs the wages required by their contracts and the ISWL.

**ARGUMENT**

**A. Defendants Forced Plaintiffs' Employment in Violation of the TVPA.**

In at least three ways, Defendants forced Plaintiffs' employment in violation of the TVPA.  First, Defendants knowingly obtained the Plaintiffs' labor or service "by means of serious harm or threats of serious harm" in violation of 18 U.S.C. § 1589(a)(2).  "'Serious harm' means any harm . . . including psychological, financial, or reputational, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same

---

[5] Federal Rule of Civil Procedure 56(a) permits a party to move for summary judgment on all or part of a claim.

background and in the same circumstances to perform or to continue to performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2); *Tanedo v. E. Baton Rouge Parish Sch. Bd*, No. LA CV10-01172 JAK (MLGx), 2011 WL 7095434, *8 (C.D. Cal. Dec. 12, 2011) (explaining that TVPA "inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions"). Here, Defendants' use of the punitive liquidated damages and promissory note penalties to force Plaintiffs to remain employed by Defendants, even during periods in which Plaintiffs were not paid (and underpaid), constitutes serious harm and a threat of serious harm.  Statement of Facts ("SOF"), ¶¶ 21-28, 43-52.

From the time that RN Staff filed an I-129 petition to secure a visa for him, Mr. Panwar was obligated to pay RN Staff at least $20,000 if he did not complete a two-year, 4,160-hour contract term with the company. SOF, ¶¶ 7, 12, 16. Twenty thousand dollars is a significant sum for anyone, but particularly for a foreign visa worker who agreed to accept a net wage of $800 to $1,000 per week. *Id.*, ¶ 28. Moreover, when Mr. Panwar started his employment with RN Staff, he found himself in a predicament:  he could not afford to leave the company and be faced with a $20,000 (minimum) penalty, but he had difficulty remaining with the company because he was not paid for the first eight months of his employment. *Id.*, ¶¶ 27-28. This predicament led to bouts of anxiety, headaches, crying, weight loss, and hair loss. *Id.*  Mr. Panwar was effectively destitute, and had to move between friend's and family member's homes, borrow money, and charge living expenses to his credit cards. *Id.* Mr. Panwar's actions in response to this predicament were reasonable:  he followed Defendants' directives as his H-1B employer, he kept studying for exams (ultimately passing the PTA exam), looked for paid client work himself, communicated often with Defendants, and continued to request paid client work from

18

Defendants. *Id.*, ¶¶ 23, 26. Ultimately, he was assigned work for which he was paid, but Defendants typically paid him below the weekly wage range to which Mr. Panwar agreed. *Id.*, ¶ 25. Despite this treatment, the threat of enforcement of his $20,000 promissory note prevented Mr. Panwar from terminating his employment. *Id.*, ¶ 20.; *See Panwar v. Access Therapies*, No. 1:12-cv-00619-TWP-TAB, 2013 WL 5486783, *8 (S.D. Ind. Sept. 30, 2013) ("it was the threat of being in debt to Defendants under the $20,000.00 Promissory Note and having his visa revoked that kept Mr. Panwar from voluntarily terminating his employment").

Similarly, from the time Access Therapies filed his I-129 petition, Mr. Agustin was obligated to pay Access Therapies at least $15,000 if he did not complete his three-year, 6,240-hour contract term with the company. SOF,¶¶ 34-36, 38.  Fifteen thousand dollars was a "huge" sum for Mr. Agustin, and he recognized at the outset that "if something happens, I wouldn't be able to do [pay] it.".  *Id.*, ¶¶ 34-36, 38, 52.   During the two extended periods in which Mr. Agustin was not assigned paid project work and thus not paid, he was unable to quit because of the $15,000 penalty.   *Id.*, ¶ 52. Mr. Agustin responded as a reasonable person in his circumstances would when faced with a $15,000 penalty: he followed Defendants' directives as his H-1B employer, he communicated often with Defendants, and continued to request paid client work. *Id.*, ¶¶ 43-46.  He also requested to be released from his contract without paying the penalty, which Defendants refused. *Id.*, ¶¶ 48-49.  He thus requested that the penalty be prorated considering that he had only nine weeks left on his contract.  *Id.*, ¶ 49. Again, Defendants refused. *Id.* As a result, Mr. Agustin was forced to remain employed.  *Id.,* ¶ 50.

Second, Defendants knowingly obtained the Plaintiffs' labor or service "by means of the abuse or threatened abuse of law or legal process" in violation of 18 U.S.C. § 1589(a)(3).  It is an abuse of legal process to use the immigration laws to coerce forced labor.  *United States v.*

*Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (affirming criminal TVPA conviction and explaining, "the immigration laws do not aim to help employers retain … employees by threats of deportation").  Here, Defendants falsely represented to the federal government that they had a Rehabilitation Coordinator position available for Mr. Panwar and a Physical Therapist position available for Mr. Agustin, and thereby received work visas for these individuals for these positions.SOF, ¶ 15, 18, 37, 42. The H-1B visas Defendants secured permitted Plaintiffs only to work for Defendants, such that they were captive to Defendants. *Id.*, ¶¶  29, 53. Only after they began their employment with Defendants (and experienced periods of no pay) did Plaintiffs learn that the positions for which Defendants secured visas did not exist.  *Id.*, ¶¶ 17-18, 40-42. But at that point, under immigration law, Plaintiffs risked deportation if they left Defendants' employment. *Id.*, ¶¶ 29-30, 53.  In this way, Defendants knowingly obtained labor through the "abuse of law or legal process." 18 U.S.C. § 1589(a)(3)

Moreover, Defendants knew of the risk of deportation, as they explicitly threatened Mr. Panwar with visa revocation on at least two occasions.  SOF, ¶ 30 (telling him, for example, "we'll be forced to cancel your visa effective tomorrow," after he filed this lawsuit). "Threatening deportation … clearly falls within the concept and definition of 'abuse of legal process' since the alleged objective for such conduct was to intimidate and coerce Plaintiffs into 'forced labor.'" *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011)) (citation and alterations omitted).[6]  Defendants' fraudulent use of the federal visa program to secure the captive employment of Plaintiffs, whom they then underpaid, and subsequent threats of deportation constitute an abuse of law or legal process in violation of the

---

[6] These threats also constituted a threat of serious harm under 18 U.S.C. § 1589(a)(2).  *See United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) ("That threat alone – to be forced to leave the country – could constitute serious harm to an immigrant") (citation omitted).

TVPA.  *See Calimlim*, 538 F.3d at 713 (finding TVPA violation where defendants "intentionally manipulated the situation so that [victim] would feel compelled to remain"); *Dann*, 652 F.3d at 1172 (citing *Calimlim*, 538 F.3d at 712) ("a victim has fewer means of escape where the threats in her case involve immigration").

Third, Defendants have operated under a "scheme, plan, or pattern," designed to coerce Plaintiffs into continued labor.  18 U.S.C. § 1589(a)(4).  This scheme and pattern included requiring all employees to sign punitive liquidated damages provisions and promissory notes, and the "routine" filing of lawsuits against employees who fail to complete their contract terms to collect the amount owed.  SOF, ¶ 8 (Defendants have filed at least 94 lawsuits in Marion Count court since 2006, the majority of which were against individuals).  Defendants' employees were aware of Defendants' "routine" of filing lawsuits against their employees. *Id.*, ¶ 52. During his employment, Mr. Agustin heard from co-workers that Defendants regularly sued employees who left before completing their contracts, and this contributed to his fear that he would owe Defendants at least $15,000 if he left before completing his contract term. *Id.* In this way, Defendants "cause[d] the [employees] to believe" that if they ended their employment, they would suffer serious harm.  18 U.S.C. § 1589(a)(3).  This enabled Defendants to underpay employees, maximize profits, and maintain a captive immigrant workforce, including Plaintiffs. SOF, ¶¶ 9, 18, 52.

Defendants' "scheme, plan, or pattern" also included securing a captive immigrant workforce by obtaining work visas through false representations to the federal government and then using the threat of visa revocation/deportation to force the immigrant workers to remain employed by Defendants. *Id.*, ¶¶ 15, 18, 29-30, 37, 42, 53. The fact that Defendants obtained visas for both Mr. Panwar and Mr. Agustin using an identical practice – falsely representing to

the government the availability of positions that in fact did not exist – and then refused to pay Plaintiffs until paid work was found, demonstrates a pattern and practice design to coerce Plaintiffs into continued employment. *Id.* Both Plaintiffs risked and feared deportation if they left Defendants' employment.  *Id.*, ¶¶ 29-30, 53.  As with the liquidated damages provisions and promissory notes, having captive visa employees, such as Plaintiffs, enabled Defendants to underpay employees and maximize Defendants' profits. *Id.*, ¶¶ 9, 29-30, 53.

Finally, each of the Defendants should be liable for these TVPA violations.  Under 18 U.S.C. § 1589(b), any person (or corporation) is liable if he "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means[.]"  *See also* 18 U.S.C. § 1595(a) (creating civil cause of action for same).  Each of the Defendants knowingly benefited from participating in the scheme that led to the forced labor of Plaintiffs.  SOF, ¶¶ 3-9, 19, 21-24, 30-31, 49. RN Staff and Access Therapies avoided paying Plaintiffs and maximized profits. *Id.,* ¶¶ 9, 25-26, 43-52.  Mr. Dhani is the exclusive manager for Access Therapies and RN Staff and serves as the companies' Chief Operating Officer.  *Id.*, ¶ 4. Mr. Garcia owns 20% of Access Therapies and RN Staff, is paid profits for the corporations' scheme, and was involved in the scheme by, for example, refusing to release Mr. Agustin from his contract or prorate his promissory note, being listed as the "Point of Contact" in LCAs who is "authorized to act on behalf of the employer in labor certification matters."  *Id.*, ¶¶ 5, 15 (and fn 3). Mr. Villegas recruited Mr. Panwar into the scheme, serves as a recruiter for RN Staff and Access Therapies, and as an employee it can be

inferred he is paid by these corporations, and explicitly threatened Mr. Panwar's immigration status after he filed this lawsuit. *Id.*, ¶¶ 6, 30-31.

### B. Defendants Violated the ISWL and Breached Plaintiffs' Contracts.

RN Staff's and Access Therapies' failure to pay Plaintiffs their full contract wages for services rendered constitutes a violation of the ISWL and a breach of Plaintiffs' contracts. SOF, ¶¶ 25, 43-52. The ISWL "govern[s] not only the frequency, but the amount an employer must pay its employees." *Panwar*, 2013 WL 5486783 at *8 (citing *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002). An employer must pay earned wages not longer than 10 days after they are earned. Ind. Code 22-2-5-1(b). "The term 'wages' means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis." Ind. Code 22-2-9-1(b). The amount of wages owed is a matter of contract between the employer and the employee. *Steele*, 766 N.E.2d 704 n.4; *see Panwar*, 2013 WL 5486783, at *9.

Liability for breach of contract is strict. *Johnson v. Scandia Assoc., Inc.*, 717 N.E.2d 24, 29 (Ind. 1999). "The slightest breach of contract, no matter how trivial or unintended, may be the basis for an action for breach of contract." *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 980 (Ind. 1993) (citing *Restatement of Contracts*, §§ 314 & 317 (1932)).

Here, RN Staff entered into a contract with Mr. Panwar to pay him "$800-$1,000 net pay per week … as compensation for services performed hereunder." SOF, ¶ 12. Once he started work for RN Staff, Mr. Panwar was not paid any amount for eight months. *Id.*, ¶ 26. Mr. Panwar performed services for RN Staff during this period of no pay. *Id.* Then, once RN Staff started to pay him, Mr. Panwar typically received less than the agreed upon $800 to $1,000 net pay per week for his services. *Id.*, ¶ 25.

23

Similarly, even though Mr. Agustin had a contract with Access Therapies in which he was to be paid $27 to $35 per hour, he was not paid any amount for the first month of his employment. *Id.*, ¶¶ 34, 43-46.  He then experienced another period of roughly ten weeks in which he received no pay.  *Id.*, ¶¶ 47-51. During these period of no payment, Mr. Agustin was performing services for Access Therapies. *Id.*, ¶¶ 34, 43-51.

Because liability for breach is strict and "[t]he slightest breach of contract … may be the basis for an action for breach of contract," *Miller Brewing Co.*, 608 N.E.2d at 980, Defendants' underpayment of Plaintiffs constitutes a breach of contract.  Moreover, because the ISWL looks to the contract between employer and employee to determine due wages, *Steele*, 766 N.E.2d 704 n.4, and the client- and non-client related work duties indisputably performed by Plaintiffs, constitute "labor" and "service" under the ISWL, Ind. Code 22-2-5-1(b), Defendants' failure to pay Plaintiffs their contractual wages constitutes a violation of the ISWL.  Accordingly, no genuine issue of material fact exists as to whether Defendants violated the ISWL or breached Plaintiffs' contracts and Plaintiffs are entitled to summary judgment as to ISWL and breach of contract liability.[7]

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted on the issue of Defendants' liability on Plaintiffs' TVPA claims.  Additionally, summary judgment should be granted on the issue of the Corporate Defendants' liability to Plaintiffs for breach of contract and violation of the ISWL.

Date:   May 9, 2014                          Respectfully submitted,

---

[7] The specific quantum of damages for both Plaintiffs' ISWL and breach of contract claims will be proven at trial.

24

/s/Michael F. Brown
Michael F. Brown
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Daniel A. Kotchen
KOTCHEN & LOW LLP
1745 Kalorama Road NW
Suite 101
Washington, DC 20009
(202) 416-1848
(202) 280-1128 (fax)
dkotchen@kotchen.com
dlow@kotchen.com

Vonda K. Vandaveer
V.K. Vandaveer, P.L.L.C.
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS,
LLP
Attorney No. 11362-49
54 Monument Circle, 4th Floor
Indianapolis, Indiana 46204
Telephone: (317) 632-4402
Facsimile: (317) 632-5595
awirick@humesmith.com

### CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filings to Defendants' counsel of record in the Court's CM/ECF system.


/s/Michael F. Brown
*Counsel for Plaintiffs*